**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

CIVIL SERVANT 1, CIVIL SERVANT 2, CIVIL SERVANT 3, CIVIL SERVANT 4, and CIVIL SERVANT 5,
c/o Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043

Plaintiffs,

v.

OFFICE OF SPECIAL COUNSEL
1730 M Street, N.W., Suite 218
Washington, D.C. 20036,

and

JAMIESON GREER, in his official capacity as Acting Director of the Office of Special Counsel,
1730 M Street, N.W., Suite 218
Washington, D.C. 20036.

Defendants.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Case No.

Plaintiffs Civil Servant 1, Civil Servant 2, Civil Servant 3, Civil Servant 4, and Civil Servant 5, proceeding under pseudonyms,[1] bring this action against the Office of Special Counsel (OSC) and the Acting Director of OSC. They allege as follows:

1. Congress created OSC to protect federal employees from unlawful employment actions. In February 2025, OSC did exactly that—it worked to stop the Trump Administration from illegally firing thousands of federal employees. So President Trump decided to remake OSC. He attacked its independence, fired the then-Special Counsel, and installed a White House loyalist as the new head of OSC. Unsurprisingly, OSC then reversed course, effectively telling the

[1] Plaintiffs' motion to proceed under pseudonyms is forthcoming.

terminated employees that OSC would no longer protect them. But OSC's actions were plainly illegal—OSC failed to provide a reasoned explanation for its abrupt reversal, and, more important, it disregarded its statutory *obligation* to protect federal employees from unlawful employment actions. Congress mandated that OSC serve as an independent safeguard to protect federal employees and preserve the federal government's merit-based system. Plaintiffs now bring this case to compel OSC to follow this mandate.

2. OSC is obligated to protect federal employees from retaliation and prohibited personnel practices (PPPs). PPPs are employment-related activities that are banned in the federal workforce because they undermine the government's statutorily-mandated commitment to a non-partisan civil service premised on merit principles. OSC is charged with investigating these prohibited practices, including actions like firing or demoting someone for political reasons, punishing whistleblowers, showing favoritism, or violating merit-based hiring and firing rules. OSC is the only agency with the authority to investigate and prosecute PPPs across the executive branch.

3. OSC's jurisdiction—as set out by Congress—includes all covered executive branch employees, including the approximately 200,000 probationary employees, new hires, and employees moving into new positions who are undergoing a one- or two-year trial period to assess their fitness for the job.

4. From its inception, and prior to the Trump Administration's hostile takeover of OSC, the agency worked to safeguard the non-partisan civil service and protect federal employees and applicants from PPPs.

5. In February 2025, to cull the civil service of workers hired or promoted during the Biden Administration, the Trump Administration directed the terminations of thousands of these probationary federal employees governmentwide. These firings were conducted *en masse*, with no individualized assessments of workers' performance or conduct. These mass firings violated federal regulations and core merit system principles codified in statute and designed to ensure the integrity of the non-partisan career civil service.

6. More than 2,000 probationary employees filed complaints with OSC, describing how their terminations constituted PPPs. OSC initially agreed there was evidence of PPPs. The then Senate-confirmed Special Counsel, Hampton Dellinger, immediately acted to protect these civil servants. He launched investigations and issued public statements affirming OSC's statutory role.

7. OSC also successfully petitioned the Merit Systems Protection Board (MSPB), the adjudicatory body for most federal personnel-related claims, to stay many of those terminations. OSC did so because it properly determined that these mass probationary terminations were in fact reductions in force, or RIFs—a means of reducing or reorganizing the federal workforce—but were implemented in violation of numerous statutes and regulations, making them unlawful PPPs.

8. But OSC's work was short-lived. Rather than respect OSC's independence and Dellinger's fixed term, which was not set to expire until 2029, the Trump Administration fired Dellinger without cause. Following Dellinger's removal, the Trump Administration installed a series of political loyalists as Acting Special Counsels. In April 2025, just weeks after Dellinger's ouster, OSC abruptly reversed course and abdicated its statutory duty to protect employees from partisan and unlawful actions. Just weeks after securing stays from the MSPB based on OSC's sound legal argument that these probationary terminations constituted PPPs, OSC issued a poorly

reasoned directive (the "Probationary Directive") explicitly reversing its position and ordering agency staff to close these investigations. This about face violated settled principles of administrative law and OSC's statutory duties under title 5 of the U.S. Code, and sent a chilling message to federal workers that OSC—a formerly independent agency—was now directly controlled by the White House and that protections granted by Congress to probationary employees could and would be set aside for political expediency.

9. The Probationary Directive was arbitrary and capricious in numerous respects. The Probationary Directive failed to adequately explain the agency's stark reversal in position, ignored the reliance interests of probationary employees that had filed valid complaints in good faith, and depends on a misreading of OSC's statutory authority. And it was plainly pretextual—cloaking political interference in the civil service under the guise of (flawed) legal interpretation. The Probationary Directive was also contrary to law. The OSC is obligated to investigate allegations of PPPs, including those alleged by employees serving in their probationary periods, and those relating to unlawful RIFs.

10. The consequences of the Probationary Directive were immediate and severe. OSC closed the more than 2,000 complaints (the "Closure Notices"), denying these employees any meaningful review.

11. Plaintiffs are among those probationary employees who received termination notices in February 2025 as part of the Administration's effort to cull the civil service. Plaintiffs were model federal employees who sought to serve their country and were selected to their positions because of their skill and dedication to their agencies' missions. They excelled in their positions and received strong early performance evaluations. None were accused of misconduct or poor performance.

12. Plaintiffs turned to OSC for protection against unlawful PPPs. They filed timely complaints with OSC asserting that their removal was a PPP. OSC initially acknowledged their complaints. And each Plaintiff was harmed when their complaint was closed summarily following the unlawful Probationary Directive.

13. Plaintiffs do not challenge OSC's discretion to resolve individual complaints on the merits. They challenge instead OSC's unlawful, ill-explained policy and its categorical exclusion of an entire class of cases, those involving probationary employees, from consideration. That policy lacks any statutory basis, is an abdication of OSC's legal mandate, and violates the Administrative Procedure Act (APA).

## PARTIES

14. Plaintiff Civil Servant 1 is proceeding under a pseudonym. She was a Biologist in the Anchorage Field Office of the National Oceanic and Atmospheric Administration (NOAA) within the U.S. Department of Commerce. Civil Servant 1 provided logistical, technical, and safety support for NOAA scientists deployed at sea, maintained field safety equipment, reviewed post-deployment data, and verified safety and enforcement reports. Supervisors repeatedly affirmed that she was meeting or exceeding expectations and intended to retain her beyond her probationary period. Yet on or about February 27, 2025, NOAA terminated her at the direction of the White House and the U.S. Office of Personnel Management without notice of performance deficiencies or misconduct. She filed a complaint with OSC in March 2025 alleging that her termination was a PPP under 5 U.S.C. § 2302. OSC acknowledged receipt, but issued a pre-closure letter in early May 2025, following the Probationary Directive, and then formally closed her complaint on May 13, 2025.

15. Plaintiff Civil Servant 2 is proceeding under a pseudonym. He is a 100% disabled veteran who held multiple civilian federal positions before joining the General Services Administration (GSA) in late 2024. Due to a break in service, he was required to serve a new probationary period. He quickly earned an "Above Fully Successful" mid-year performance rating. On February 6, 2025, GSA managers informed probationary employees that positions were at risk due to the President's direction to cut staff. Days later, Civil Servant 2 received a formal termination letter stating it was not "in the best interest of the government" to retain him but cited no performance or misconduct issues. He filed a complaint with OSC in March 2025 alleging that his termination was a PPP under 5 U.S.C. § 2302. OSC acknowledged receipt, but following the Probationary Directive, it closed the complaint on May 23, 2025. Due to a series of court-imposed injunctions related to other litigation, he was briefly reinstated after initially being terminated in February 2025, but he was then terminated (again) in July 2025.

16. Plaintiff Civil Servant 3 is proceeding under a pseudonym. She joined the Department of Health and Human Services (HHS), Administration for Children and Families, in May 2024 as a Senior Policy Advisor. She had received an "Outstanding" performance rating and was repeatedly praised for her leadership in interagency initiatives. Nevertheless, in February 2025, she received a memorandum informing her that she was being terminated and would be placed on administrative leave, effective immediately, and that termination would be effective on March 14, 2025, despite no record of poor performance or misconduct. She filed a complaint with OSC in March 2025 alleging that her termination was a PPP under 5 U.S.C. § 2302. OSC acknowledged receipt, but following the Probationary Directive, it closed the complaint in May 2025. Plaintiff Civil Servant 3 remained on administrative leave until June 2025 when she departed from her position.

17. Plaintiff Civil Servant 4 is proceeding under a pseudonym. She is an environmental science professional who joined the Environmental Protection Agency (EPA) in February 2024 as a Public Affairs Specialist in the Office of Chemical Safety and Pollution Prevention. She was consistently evaluated as an effective performer, had been recommended for conversion to permanent status, and was on the cusp of conversion when she was targeted for termination on February 14, 2025, less than two weeks before her probationary period ended. She filed a complaint with OSC in March 2025 alleging that her termination was a PPP under 5 U.S.C. § 2302. OSC acknowledged receipt, but following the Probationary Directive, it closed the complaint in May 2025. Plaintiff Civil Servant 4 was on administrative leave when she departed her position that same month.

18. Plaintiff Civil Servant 5 is proceeding under a pseudonym. He was an attorney who began working at the Commodity Futures Trading Commission (CFTC) in July 2024 in its Division of Enforcement. He had practiced law for over a decade in private practice, joined federal service out of a commitment to public enforcement work, and received positive feedback from supervisors throughout his tenure. On February 19, 2025, without prior notice, he was terminated along with several other probationary employees in his office. He filed a complaint with OSC alleging that his termination was a PPP under 5 U.S.C. § 2302. OSC acknowledged receipt, but following the Probationary Directive, it closed the complaint in May 2025.

19. Defendant OSC is an independent federal agency headquartered in Washington, D.C. OSC is responsible for investigating and prosecuting PPPs under 5 U.S.C. § 2302. It is charged with safeguarding current and former employees, as well as applicants for federal employment, from retaliation and other PPPs.

20. Defendant Jamieson Greer is the Acting Special Counsel of OSC and is sued in his official capacity. The Acting Special Counsel is responsible for the implementation and enforcement of OSC policies and directives, including the Probationary Directive and closure notices at issue in this case.

**JURISDICTION AND VENUE**

21. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1346. This Court also has authority to issue declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 *et seq.*, and the APA, 5 U.S.C. §§ 701 *et seq*.

22. Venue is proper in the U.S. District Court for the District of Columbia pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1). Defendants are agencies or officers of the United States sued in their official capacities and a substantial part of the events or omissions giving rise to this action occurred and continue to occur within this district.

**LEGAL FRAMEWORK**

23. The APA, 5 U.S.C. §§ 701-706, authorizes judicial review of final agency actions. Under the APA, a court may set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," that exceeds an agency's statutory authority, or that is adopted "without observance of procedure required by law." *See* 5 U.S.C. § 706(2)(A), (C), (D).

24. OSC is governed by 5 U.S.C. §§ 1211-1218. By statute, OSC is required to:

"protect employees, former employees, and applicants for employment from prohibited personnel practices," (§ 1212(a)(1));

"receive and investigate allegations of prohibited personnel practices," (§ 1212(a)(2)); and

"conduct an investigation of any allegation concerning … activities prohibited by any civil service law, rule, or regulation, including any activity relating to political intrusion in personnel decisionmaking," (§ 1216(a)(4)).

25. Merit system principles, codified at 5 U.S.C. § 2301, set forth the foundational values that govern federal personnel management. These principles require, among other things, that recruitment and advancement be based on ability and qualifications, that employees receive fair and equitable treatment without regard to political affiliation or other non-merit factors, and that protection be provided against arbitrary action, personal favoritism, and coercion for partisan political purposes. The principles also promote whistleblower protection and emphasize high standards of integrity, conduct, and concern for the public interest.

26. PPPs, codified at 5 U.S.C. § 2302, are employment-related activities that are banned in the federal workforce because they violate the merit system through some form of employment discrimination, retaliation, improper hiring practices, or failure to adhere to laws, rules, or regulations that implement or directly concern the merit system principles. They include, among other things, hiring or firing based on political affiliation, retaliating against whistleblowers, or granting unauthorized preferences.

27. OSC's obligation to prohibit PPPs extends to "any employee or applicant for employment," in an agency as defined in 5 U.S.C. § 2302(a)(2)(C), which includes probationary employees serving in the competitive or excepted service. *See* 5 U.S.C. § 2302. A probationary employee in the federal government is generally a new hire or an employee moving into a new position who is undergoing a trial period to assess their fitness for the job. This period typically lasts one year for competitive service or Senior Executive Service positions or two years for excepted service positions, allowing the agency to evaluate the employee's performance and conduct before granting a permanent appointment.

28. Federal employees (including those in probationary status), former employees, and applicants who believe they have been subjected to a PPP may file a complaint with OSC, which serves as the independent investigative and enforcement body for these claims. *See* 5 U.S.C. § 1214.

29. When OSC receives a PPP complaint, it is required to investigate to determine whether there are reasonable grounds to believe a violation occurred. *See* 5 U.S.C. § 1214. If OSC finds such grounds, it can seek corrective action from the employing agency, negotiate a resolution, or, if necessary, file a petition with the MSPB to obtain relief for the complainant. *See id*. § 1214(b)(2)(B).

30. In some cases, such as with potentially unlawful removals, OSC has authority under 5 U.S.C. § 1214(b)(1)(A)(i) to request an MSPB stay of the personnel action, temporarily halting the agency's action while OSC investigates. MSPB stay petitions require OSC to present its legal and factual basis, and if granted, the stay remains in effect for 45 days (which can be extended), so that OSC can complete its investigation or negotiate relief. If OSC declines to seek corrective action, it must inform the complainant, who may then have other avenues of review depending on their statutory rights.

31. While OSC retains discretion in how to resolve individual complaints, it may not categorically refuse to investigate entire classes of complaints that fall within its statutory authority. A blanket refusal to investigate, especially when based on a legally erroneous interpretation of its authority, is an abdication of OSC's statutory responsibility and is subject to judicial review under the APA.

## ALLEGATIONS

### *The Origin, Purpose, and Independence of OSC*

32. For more than 140 years, meritocratic principles have been essential to the efficient and continuous operation of the career civil service.

33. Before that, a "spoils system" reigned and each successive president simply filled federal jobs with political allies. Under this patronage system, positions were not filled based on qualifications or merit, and when presidential administrations changed, employees were regularly dismissed from government regardless of how well they had performed their duties. The spoils system was rife with corruption. By 1832, Senator Henry Clay called it

> a detestable system. . . And if it were to be perpetuated—if the offices, honors, and dignities of the people were to be put up to public scramble, to be decided by the result of every presidential election—our Government and institutions, becoming intolerable, would finally end in despotism.

Jay M. Shafritz et al., *Personnel Management in Government: Politics and Process* (5th ed. 2001).

34. The Pendleton Act of 1883 ended the spoils system and created the competitive civil service, wherein employees were hired on the basis of their knowledge and expertise, not political ideology. Subsequent congressional and executive actions have consistently moved the federal civil service in one direction: toward greater protections and political insulation for members of the career civil service, and toward a greater proportion of the federal workforce being covered by these protections. This progress has been charted to improve the efficiency and effectiveness of the federal government as it works for the American people. The civil service system was intended to eliminate the myriad ills of the spoils system: the inefficiency of quadrennial patronage scrambles, the inferior quality of workers selected for reasons besides merit, the loss of expertise attendant to regular purges of the civil service ranks, and the perils of a workforce loyal to an individual president or administration.

35. Whereas the Pendleton Act eliminated the spoils system and introduced a merit-based civil service as a key pillar of our democratic system, the Civil Service Reform Act ("CSRA") of 1978, Pub. L. No. 95-454, 92 Stat. 1111, was the signature, bipartisan reform that has most shaped the system we have today. It created a "new framework" of the modern civil service, provided clear protections for career federal employees against undue partisan political influence, and extended adverse action rights by statute to a larger cohort of employees, so that the business of government can be carried out efficiently and effectively, in compliance with the law, and in a manner that encourages individuals to apply to participate in the civil service. *See Lindahl* v. *Office of Personnel Mgmt.,* 470 U.S. 768, 773 (1985) (explaining that the CSRA "overhauled the civil service system"); *see also United States* v. *Fausto,* 484 U.S. 439, 443 (1988).

36. The CSRA was one of Congress's comprehensive responses to the vulnerabilities in civil service protections exposed during the Nixon administration.

37. A central goal of the CSRA was to ensure meaningful review of adverse personnel actions and ensure that "[e]mployees are . . . protected against arbitrary action, personal favoritism, and from partisan political coercion."[2] It was designed to ensure that federal employment decisions are based on merit—not political loyalty, patronage, or personal favoritism.[3]

38. Congress codified a set of merit system principles and PPPs that form the foundation of a professional, nonpartisan federal workforce. As explained above, these include protections for whistleblowers; requirements for open and competitive hiring; pay comparability; efficient use of the workforce; and fair and equitable treatment of employees. 5 U.S.C. § 2301(b).

---

[2] S. Rep. No. 95-969, at 19 (1978), *reprinted in* 1978 U.S.C.C.A.N. 2723, 2741.

[3] CSRA, Pub. L. No. 95-454, § 101, 92 Stat. at 1114; *see also* Fong, Bruce D., *Whistleblower Protection and the Office of Special Counsel: The Development of Reprisal Law in the 1980's*, 40 Am. U.L. Rev. 1015, 1017-18 (1991); *see also* CSRA, 92 Stat. 1111-1116.

39. To help carry out these protections, Congress, in the CSRA, created OSC and vested it with broad authority and mandate to receive and investigate allegations of PPPs, seek corrective action for employees subjected to such practices, bring disciplinary charges against offending officials, and enforce the Hatch Act. *See* 5 U.S.C. §§ 1212, 1214, 1215.

40. In 1989, Congress enacted the Whistleblower Protection Act, Pub. L. No. 101-12, 103 Stat. 16, which clarified OSC's primary role as the federal government's independent protector of whistleblowers and other employees subjected to PPPs, and affirmed OSC's independent status within the executive branch.

41. OSC possesses broad investigative and enforcement powers, including the ability to: compel testimony under oath; issue subpoenas; obtain documents; take depositions; receive evidence; bring corrective action petitions before the MSPB; recommend or initiate disciplinary action; and transmit disclosures of legal violations, gross mismanagement, abuses of authority, or threats to public safety to agency heads or the Attorney General. *See* 5 U.S.C. §§ 1212(b), 1213, 1214, 1215.

42. OSC also has statutory authority under 5 U.S.C. § 1214(b)(1)(A)(i) to request a stay of a personnel action from the MSPB where it has reasonable grounds to believe that an agency action was taken as a result of a PPP.

43. OSC's ability to investigate and protect against PPPs is a core safeguard of the federal civil service system. This is especially true for probationary employees. Because probationary employees generally cannot appeal adverse actions to the MSPB, OSC is often the only avenue available to protect them from retaliation, political interference, and other PPPs. Without OSC's oversight, agencies could treat probationary employees in unlawful ways. OSC

serves as a backstop to prevent the erosion of merit-based protections during the earliest stage of federal employment.

44. While OSC has discretion in how to conduct investigations and allocate resources, it is also bound by mandatory statutory obligations under title 5, as explained above.

45. These include the obligations to receive and investigate complaints of PPPs and protect employees from them. More broadly, OSC must investigate activities prohibited by *any* civil service law or rule. *See Bufkin v. Collins*, 145 S. Ct. 728, 737 (2025) ("It is undisputed that the word 'shall' imposes a mandatory command. 'Shall' means 'must.'") (citing *Shapiro v. McManus*, 577 U.S. 39, 43 (2015) and *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171-172 (2016)).

46. To preserve its independence, Congress provided that the Special Counsel is appointed by the President with Senate confirmation and may be removed only for cause, specifically, "inefficiency, neglect of duty, or malfeasance in office." *See* 5 U.S.C. § 1211(b). This structure distinguishes OSC from typical executive agencies and was designed to insulate it from political influence.

47. These for-cause protections reflect Congress's intent that the Special Counsel serve as an impartial enforcer of civil service laws, independent from political pressures that might otherwise compromise OSC's mission.

48. In 2023, the Senate confirmed Hampton Dellinger to serve as Special Counsel.

49. Since the beginning of the current Trump Administration, however, the career civil service as well as the structure, operations, and independence of OSC, as carefully designed by Congress nearly fifty years ago, have come under sustained attack.

***The Trump Administration's Assault on the Career Civil Service***

50. Since returning to power, the Trump Administration has made clear its intent to (1) dismantle the career civil service because it views career federal employees not as nonpartisan professionals fulfilling their duties, but as obstacles to the Administration's policy objectives; (2) fill the federal workforce ranks with loyalists; and (3) systematically undermine the very institutions, including OSC, that Congress created to enforce civil service protections and uphold the rule of law.

51. President Trump has publicly disparaged career civil servants as "crooked," "dishonest" and "corrupt."[4] On the first day of his second term, he declared that "most" federal employees "are being fired" and added that "it should be all of them."[5]

52. Vice President JD Vance echoed this hostility, stating that President Trump should, "fire every single mid-level bureaucrat, every civil servant in the administrative state. Replace them with our people."[6]

53. The Administration's contempt for the professional federal workforce is not limited to the President and Vice President. In a February 2025 memo, Office of Management and Budget Director Russell Vought and Office of Personnel Management then-Acting Director Charles Ezell condemned what they called a "corrupt federal bureaucracy."[7] Vought has also proclaimed:

---

[4] Erich Wagner, *Trump's second-term agenda: Breaking the bureaucracy*, Gov't Exec. (Sep. 16, 2024), https://perma.cc/WY46-GXL9; Erich Wagner, *Trump calls federal workforce 'crooked,' vows to hold them 'accountable'*, Defense One (Aug. 28, 2024), https://perma.cc/YVH3-6LNW.

[5] Erich Wagner, *Trump: Agencies should fire 'all' bureaucrats*, Gov't Exec. (Jan. 20, 2025), https://perma.cc/9V4F-KG2W.

[6] Joe Davidson, *Trump's second-term agenda plans a purge of the federal workforce*, Wash. Post (July 26, 2024), https://perma.cc/H9AD-7G2B.

[7] Mem. from Russell Vought, Dir., Off. of Mgmt. & Budget, and Charles Ezell, Dir., Off. of Pers. Mgmt., to heads of executive departments and agencies, *Guidance on Agency RIF and Reorganization Plans Requested by Implementing The President's "Department of Government Efficiency" Workforce Optimization Initiative* (Feb. 26, 2025), https://perma.cc/7CCD-7LR6.

> "We want the bureaucrats to be traumatically affected," he said. "When they wake up in the morning, we want them to not want to go to work because they are increasingly viewed as the villains....We want to put them in trauma."[8]

54. President Trump further advanced this agenda through Executive Order 14,171, reinstating Schedule F under an effort rebranded as Schedule Policy/Career, which aims to strip civil service protections from a wide swath of career civil servants to facilitate the at-will removal of federal employees. As he signed the Executive Order, the President declared that he was "getting rid of all the cancer, the cancer caused by the Biden administration."[9]

55. The Administration has recently escalated its campaign against career civil servants engaged in whistleblowing and oversight activities. For instance, at the Federal Emergency Management Agency (FEMA), employees who signed a letter to Congress objecting to the Administration's handling of disaster response have faced reprisal.[10] At the U.S. Environmental Protection Agency (EPA), multiple employees were recently fired after raising concerns about their agency's actions to undermine core environmental protections.[11] These actions are emblematic of a broader strategy of firing or sidelining civil servants and the urgent need to safeguard whistleblowers from retaliation.

56. In addition to firing and attacking nonpartisan civil servants, the Administration has turned to politicized hirings to reshape the federal workforce in its own ideological image. President Trump issued Executive Order 14,317 in July 2025 announcing the creation of "Schedule

---

[8] Molly Redden, Andy Kroll & Nick Surgey, *"Put Them in Trauma": Inside a Key MAGA Leader's Plans for a New Trump Agenda*, ProPublica (Oct. 28, 2024), https://perma.cc/L6YC-VUVF.

[9] 90 Fed. Reg. 8625 (Jan. 20, 2025); Alan Rappeport, *Federal Employees Union Sues Trump Over Worker Protections*, N.Y. Times (Jan. 21, 2025), https://perma.cc/G6LD-N3SX.

[10] Luke Bar, *FEMA employees who signed letter Monday critical of admin placed on leave*, ABC News, (Aug. 27, 2025), https://perma.cc/H9AT-NGJ2.

[11] Assoc. Press, *EPA fires employees who publicly criticized agency policies under Trump*, CNN, (Aug. 30, 2025), https://perma.cc/3S36-8DWT.

G," a new excepted service category to expand the number of noncareer, political positions that are purportedly "policy-making or policy-advocating," allowing these positions to be fired at will, without civil service protections. And the new Schedule G could allow the President to redefine an untold number of career positions as political positions and open positions across the government for Trump loyalists, with no limit on hires.[12]

57. The Administration also recently unveiled a "Merit Hiring Plan" that can be used to screen applicants based on their loyalty to the President's Executive Orders. Applicants are asked to identify which of President Trump's policies and Executive Orders are "significant" to them and describe how they would help implement those priorities if hired, an overt politicization of the merit-based hiring process.

58. And all of this is happening at the same time that the Trump Administration is systematically attacking the institutions that Congress created to prevent these illegal abuses and safeguard a merit-based system.

59. The Administration is weakening the independence of the MSPB, the agency responsible for adjudicating appeals of adverse personnel actions. The MSPB was designed by Congress to be a three-member bipartisan board. Board members are appointed by the President and confirmed by the Senate to serve staggered seven-year terms and, under 5 U.S.C. § 1202(d), may be removed only for inefficiency, neglect of duty, or malfeasance in office. In February 2025, however, President Trump removed Chair Cathy Harris, a Democratic appointee, without citing any of the statutory grounds for removal, in clear (and admitted) violation of the statute. President

[12] 90 Fed. Reg. 34753 (July 17, 2025); Eric Katz, *Trump creates 'Schedule G' to add more political appointees to agencies top ranks*, Gov't Exec. (July 18, 2025), https://perma.cc/AZ6X-4DCG; Nick Bednar, *The End Game for Schedule G*, Lawfare (July 24, 2025), https://perma.cc/VTM2-XSXT.

Trump's attack on the independence of the MSPB directly undermines the CSRA's remedial framework and risks leaving federal employees without an independent, effective forum to challenge unlawful actions.[13]

60. In another blow to federal accountability structures, President Trump removed multiple Inspectors General, the very officials (in addition to the Special Counsel) to whom employees would ordinarily report misconduct or whistleblower retaliation.[14]

61. Still further, the Administration has moved to curtail collective bargaining rights for hundreds of thousands of federal employees.[15] In doing so, it aims to eliminate access to grievance and arbitration procedures, depriving civil servants of critical safeguards against unwarranted adverse actions and retaliation.[16]

62. And, of course, as relevant here and as discussed throughout this complaint, the Trump Administration is dismantling the independence of OSC

63. Taken together, these and other actions[17] reflect a coordinated campaign to purge, politicize, and control the federal workforce while dismantling the guardrails Congress installed

---

[13] *Special Couns. ex rel. Klein v. Dep't of Veterans Affs*., 124 M.S.P.R. 191, 193 (2017) (indicating board must have more than one member for quorum).

[14] Aneeta Mathur-Ashton, *What Happens When the Watchdogs Are Fired? America Is About to Find Out*, U.S. News & World Report (Apr. 15, 2025), https://perma.cc/25ZL-DFXW.

[15] Michael Kunzelman, *Judge blocks Trump administration from nixing collective bargaining for most federal employees*, Assoc. Press (Apr. 25, 2025), https://perma.cc/4LM6-M65N.

[16] 5 U.S.C. § 7121.

[17] For instance, the Trump Administration has targeted Senior Executive Service (SES) members through a series of actions, including through memoranda "Restoring Accountability for Career Senior Executives," (Jan. 20, 2025) and guidance permitting redesignation of key SES positions, such as Chief Human Capital Officers (CHCOs), to politically appointed roles. *See* Off. of Pers. Mgmt., *Guidance Regarding Redesignating CHCO Positions*, (Mar. 6, 2025), https://perma.cc/5AF9-KZ6K. It also has proposed drastic changes to the suitability and fitness regulations that would expand subjective and potentially ideological criteria for determining who may enter or remain in the federal workforce. *See* Suitability and Fitness, 90 Fed. Reg. 23467 (proposed June 3, 2025); White House, Mem. to Dir. of Off. of Personnel Mgmt., *Strengthening the Suitability of the Federal Workforce*, (Mar. 20, 2025), https://perma.cc/3ZZ7-RUKZ.

to prevent precisely this kind of political capture. The Administration is not only targeting individual civil servants but threatening the nonpartisan foundation of the modern federal workforce.

***The Trump Administration's Probationary Employee Terminations***

64. The Trump Administration's assault on the civil service has also extended to probationary employees, virtually all of whom had been hired or promoted by the previous administration. Shortly after the Inauguration, the Office of Personnel Management (OPM), the chief human resources agency and personnel policy manager for the federal government, issued guidance on probationary periods, advising agencies that probationary periods are "an essential tool for agencies to assess employee performance and manage staffing levels," and directing agencies to provide OPM with a list of all probationary employees, and instructing agencies to "promptly determine" whether probationary employees should be retained.[18]

65. On February 11, 2025, the President issued an Executive Order directing agency heads to "promptly undertake preparations to initiate large-scale reductions in force…" and to develop "[r]eorganization [p]lans."[19]

66. Between February 12 and 14, 2025, the Trump Administration initiated a sweeping government-wide effort to terminate thousands of probationary federal employees.[20] The culling

[18] *See* Exec. Order 14,158, *Establishing and Implementing the President's "Department of Government Efficiency*, 90 Fed. Reg. 8441 (Jan. 20, 2025); Off. of Pers. Mgmt., *Guidance on Probationary Periods, Administrative Leave and Details* (Jan. 20, 2025), https://perma.cc/FW8K-AWME.

[19] Exec. Order 14,210, *Implementing The President's "Department of Government Efficiency" Workforce Optimization Initiative*, 90 Fed. Reg. 9669 (Feb. 11, 2025); *see* White House, *Fact Sheet: President Donald J. Trump Works to Remake America's Federal Workforce* (Feb. 11, 2025), https://perma.cc/T7GF-WRE4 (explaining that DOGE will assist with "shrink[ing] the size of the federal workforce," "large-scale reductions in force," "reducing the size and scope of the federal government," and "shrink[ing] the administrative state.").

[20] Michael Embrich, *Trump and Musk's Valentine's Day Massacre of Military Veterans*, Rolling

took place across the federal government—at the Departments of Energy, Veterans Affairs, Education, Agriculture, Interior, among many others—and followed terminations of scores of probationary workers at the Consumer Financial Protection Bureau and the Small Business Administration. At the time of the firings, there were approximately 200,000 probationary employees in the federal workforce.[21] These terminations were reportedly executed without any individualized assessment of performance, conduct, or fitness for continued employment and many of the termination notices were riddled with errors.

67. Soon after the terminations, probationary employees began filing complaints with OSC, alleging that these terminations were unlawful and constituted PPPs. Many requested that OSC exercise its authority under 5 U.S.C. § 1214 to petition the MSPB for stays of their removals.

68. On February 21, 2025, OSC filed a stay request with the MSPB on behalf of six probationary employees, which the Board granted. *See* Ex. A (Feb. 21, 2025, OSC Stay Request); Ex. B (Feb. 28, 2025, MSPB Order on Stay Request). A few days later, on February 28, 2025, OSC expanded its effort and successfully obtained a broader stay of over 5,000 probationary terminations at the U.S. Department of Agriculture (USDA). *See* Ex. C (Feb. 28, 2025, OSC Stay Request); Ex. D (Mar. 5, 2025, MSPB Order on Stay Request).

69. In its stay petitions, OSC, under Special Counsel Dellinger, explained how its investigation revealed that the mass terminations of probationary employees were in fact unlawful RIFs, conducted as part of the Trump Administration's efforts to reduce and reorganize the federal workforce, disguised as probationary removals.

---

Stone (Feb. 14, 2025), https://perma.cc/TYT9-LU98.

[21] Tami Luhby et al., *Thousands of probationary employees fired as Trump administration directs agencies to carry out widespread layoffs*, CNN (Feb. 14, 2025), https://perma.cc/WF58-F5HP.

70. As OSC explained, the *en masse* probationary terminations were part of a centralized Trump Administration effort to reduce and reorganize the federal workforce, with OPM not only directing agencies to carry out this effort, but also instructing them how to do so.

71. In particular, with respect to the USDA probationary terminations, OSC stated that "[d]ocuments that OSC obtained and interviews that OSC conducted with USDA officials confirmed that USDA relied heavily on OPM guidance in terminating its probationary employees." Ex. C, at 4.

72. OSC explained that "OPM provided verbal guidance in a February 12, 2025, meeting of the Chief Human Capital Officer (CHCO) Council about terminating probationary employees and then emailed a termination letter template for agencies to use in effecting those terminations." *Id.* Later that evening, according to OSC, OPM emailed USDA and other agencies with additional guidance; the email stated: "Please partner with your CHCO to action those you know you wish to separate from [sic] by the end of the day tomorrow 2/13/2025, using the attached template letter (modified to account for whether the employee is in the competitive or excepted service)." *Id*. OSC explained that this email "specified that agencies could exempt probationary employees that agencies had identified as 'high-performing employees in mission critical areas.'" *Id.* at 5.

73. OSC explained that the next day, February 14, 2025, OPM convened a "Special Session" of the CHCO Council for the purpose of further discussing the probationary terminations. OSC noted that, in that meeting, "OPM reinforced the centrality of the 'mission-critical' designation," and, in a follow-up email after the meeting, OPM stated, "'We have asked that you separate probationary employees that you have not identified as mission-critical no later than end of day Monday, 2/17.'" *Id*. According to OSC, OPM's email also noted: "'An employee's

performance must be viewed through the current needs and best interest of the government, in light of the President's directive to dramatically reduce the size of the federal workforce." *Id.* And, according to OSC, OPM's email stated, "'OPM believes "qualifications for continued employment" in the current context means that only the highest-performing probationers in mission-critical areas should be retained.'" *Id*.

74. OSC's investigation revealed that USDA began terminating probationary employees "[o]n February 13, 2025, one day after OPM provided its initial guidance and termination template." *Id*. OSC explained that the evidence it gathered showed that USDA created two template termination letters, "one for probationary employees in the competitive service and one for probationary employees in the excepted service, which it used to draft the mass terminations it sent to…each of the nearly six thousand" terminated probationary employees. *Id*. at 6. According to OSC, "[t]hese templates were in turn based on the OPM template." *Id*. Further, according to OSC, "USDA officials understood OPM's February 12, 2025 email to be an instruction to begin terminating probationary employees who had not been identified as mission-critical. USDA officials also took OPM's guidance to mean that the agency lacked discretion to retain probationary employees who did not hold mission-critical positions, regardless of their performance." *Id*.

75. OSC stated that its investigation revealed that USDA terminated approximately 5,900 probationary employees. OSC explained, "OSC's investigation confirmed that USDA made no attempt to assess the individual performance or conduct of any of these probationary employees before deciding whether to terminate them—the decision to retain a particular probationary employee depended entirely on whether their position was designated as mission-critical." *Id*. at 7. Further, according to OSC, "[w]hether USDA terminated each probationary employee therefore

depended entirely on the nature of that employee's position, not on the adequacy of their performance or fitness for federal service." *Id.*

76. This was the same approach that other agencies took as well. On February 21, 2025, a week before filing its stay request with the MSPB related to all USDA's probationary terminations, OSC filed stay requests on behalf of six terminated probationary employees at six different agencies: the Department of Education, the Office of Personnel Management, the Department of Energy, the Department of Veterans Affairs, the Department of Housing and Urban Development, and USDA.[22] *See* Ex. A.

77. As OSC explained, each of the six probationary employees at six different agencies were terminated as part of a centrally-directed, governmentwide termination of probationary employees. "[E]ach was terminated at the same time as significant numbers of other federal employees," and "[t]he language in Complainants' termination notices is quite similar and does not describe any specific issues with any of the Complainants' performance or conduct," with "none provid[ing] any detail or individualized assessment." *Id.* at 3-4. Therefore, based on "official directives, public statements, and the termination notices issued to Complainants, it appears that the Agencies terminated probationary employees not to eliminate poor performance but rather because of a purported lack of work, shortage of funds, and reorganization, which require use of RIF procedures." *Id.* at 12.

78. As OSC explained—in both its February 21 filing related to employees at six agencies and its February 28 filing related to all USDA terminations—such probationary terminations constituted PPPs under 5 U.S.C. § 2302(b)(12), which prohibits personnel actions

---

[22] *See* U.S. Off. of Special Counsel, *Special Counsel Dellinger Statement on Request That MSPB Stays Terminations of Probationary Employees* (Feb. 24, 2025), https://perma.cc/3EXT-R3WN.

that violate any law, rule, or regulation implementing or directly concerning the merit system principles outlined in § 2301. Additionally, OSC cited its statutory duty under 5 U.S.C. § 1216(a)(4) to investigate "activities prohibited by any civil service law, rule, or regulation."

79. OSC explained that the mass terminations were not based on individual performance or misconduct but were in fact actions carried out pursuant to the Trump Administration's directives to reduce and reorganize the federal workforce. As such, they were RIFs in substance if not in name and thus subject to the legal requirements governing RIFs under federal law.

80. The agencies, however, failed to follow any of the applicable statutory and regulatory requirements for conducting a lawful RIF. These failures rendered the actions unlawful and, as OSC explained, transformed them into PPPs. Specifically, the agencies violated 5 U.S.C. § 3502, the statutory provision that authorizes reductions in force, and the RIF implementing regulations at 5 C.F.R. Part 351, which directly implicate numerous merit system principles, including:

a. Selection and advancement should be determined solely on the basis of relative ability, knowledge, and skills, 5 U.S.C. § 2301(b)(1);
b. All employees should receive fair and equitable treatment with proper regard for their constitutional rights, 5 U.S.C. § 2301(b)(2);
c. The federal work force should be used efficiently and effectively, 5 U.S.C. § 2301(b)(5);
d. Employees should be retained on the basis of the adequacy of their performance, 5 U.S.C. § 2301(b)(6);
e. Employees should be protected against arbitrary action, 5 U.S.C. § 2301(b)(8)(A).

81. As OSC articulated, the RIF requirements in 5 U.S.C. § 3502 and 5 C.F.R. Part 351 are statutes and regulations that directly concern multiple merit system principles. Thus, an agency's failure to comply with the RIF requirements in § 3502 and its implementing regulations constitutes a violation of § 2302(b)(12), making the terminations PPPs.

82. OSC emphasized that the RIF statutes and regulations afford employees vital substantive and procedural rights, which the agencies ignored. Rather than follow lawful RIF procedures, agencies improperly relied on probationary status to bypass those protections. In doing so, and as OSC explained, agencies "used the probationary status of employees to accomplish a RIF without affording the employees the substantive rights and due process they are entitled to by law." *See* Ex. A, at 10. Accordingly, these terminations are contrary to "law, rule, or regulation implementing or directly concerning the merit system principles," *id.* at 9, and constitute PPPs.

83. In addition to the RIF-related violations, OSC also argued that the agencies had violated another set of regulations that directly concern merit system principles, namely, 5 C.F.R. §§ 315.801 *et seq.*, which at the time prohibited termination of probationary employees in the competitive service for reasons unrelated to the employee's individual fitness for federal employment. As OSC explained to the MSPB, the terminations plainly did not stem from individual assessments but from broad directives to eliminate a category of civil servants wholesale.

***The Removal of Hampton Dellinger and OSC's Sudden Reversal of Position***

84. While OSC was seeking a stay of the probationary terminations before the MSPB, President Trump was simultaneously seeking to remove Special Counsel Dellinger, even though Dellinger's statutory five-year term was not set to expire until 2029. *See* 5 U.S.C. § 1211(b).

85. Dellinger was initially removed by President Trump in February 2025, but Dellinger challenged his removal in federal court, asserting that his for-cause removal protections under § 1211 barred the President from terminating him without a showing of inefficiency, neglect of duty, or malfeasance. Although a district court initially enjoined the termination, the D.C. Circuit lifted the stay on appeal. On March 6, 2025, Dellinger withdrew his legal challenge and vacated his position as Special Counsel.

86. Following Dellinger's departure, the Trump Administration installed a succession of politically aligned Acting Special Counsels. First came Doug Collins, who simultaneously served as Secretary of Veterans Affairs, followed by the current Acting Special Counsel, Jamieson Greer, a senior White House official and U.S. Trade Representative.

87. The current nominee to serve as the permanent Special Counsel is Paul Ingrassia. As reported by news outlets:

> In contrast to prior leaders of the Office of Special Counsel, who typically had years of legal experience, Ingrassia has only briefly worked as a lawyer. He graduated from Cornell Law School in 2022 and became a registered attorney in New York less than a year ago, in July 2024. He caught the eye of the president through his pro-Trump blog posts during the 2024 presidential campaign and joined the administration in January 2025.[23]

88. News reports note Ingrassia's views about the federal workforce he would be tasked with protecting:

> The idea that civil servants are "apolitical" has always been hogwash, a myth propounded by these very same people who never want to be held responsible for anything,' he wrote on a conservative site in November.
>
> Amid the U.S. DOGE Service's slashing of the federal workforce, Ingrassia wrote on Substack that 'all the worst elements of human nature—arrogance and ego, combined with laziness and stupidity—become magnified in a bureaucratic government system … the

[23] *See* Tom Dreisbach, *Trump nominates official with ties to antisemitic extremists to lead ethics agency*, N.P.R., (May 30, 2025), https://perma.cc/FFM7-CKF5.

> workers themselves acclimate to doing little of anything of substance, always on the taxpayer's dime....[24]

89. The change in OSC leadership resulted in an immediate and dramatic reversal of legal positions. On April 8, 2025, OSC, under the leadership of Acting Special Counsel Greer, issued the Probationary Directive, instructing staff to close all ongoing investigations into mass probationary terminations on the ground that such actions no longer qualified as PPPs. *See* Ex. E (Apr. 8. 2025, OSC Directive).

90. The Probationary Directive, issued by a new political appointee, Senior Counsel Charles Baldis, acting under delegated authority from Acting Special Counsel Greer, directed investigators to conduct only a "simple review" of probationary complaints and to close those investigations unless the complainant articulated *separate* allegations of whistleblowing or similar. *Id.*

91. The Directive abruptly changed OSC's position—and abandoned OSC's prior factual findings—that the probationary terminations constituted a RIF. The Directive, without further factual inquiry, decreed that because there was "no well-established precedent that the targeting of probationary employees as a class constitutes a RIF," OSC would not intervene "into this unsettled legal question" and would instead treat these terminations as "ordinary." *Id.* at 2.

92. The Directive also rejected OSC's prior conclusion that the probationary terminations violated then-operative regulations protecting probationary employees from arbitrary firing. The Directive explained that the regulatory protections provided to probationary workers—including notice and limited process for probationers terminated because of their qualifications,

[24] Meryl Kornfield, Cleve R. Wootson, Jr., *Trump's pick to protect federal workers shares a disdain for them*, Wash. Post (July 24, 2025), https://perma.cc/R6KJ-VLFD.

fitness, and performance—did not bear on whether or how an agency may terminate those probationers for reasons totally unrelated to their fitness or performance. *Id.* at 3-4.

93. The Probationary Directive also asserted that OSC's review should mirror the narrow appeal rights under a separate framework concerning direct appeals to the MSPB, *id.* at 4, despite Congress's directive that probationary employees *are* protected from PPPs and within OSC's jurisdiction and mandate. *See* 5 U.S.C. 2302(a)(2).

94. And pursuant to the Directive, OSC advised that absent distinct, individualized allegations of discrimination or similar, it would not investigate whether probationary terminations violated merit system principles but would instead "terminate the investigation." *Id.*

95. Consistent with the new policy, OSC began issuing mass Closure Notices beginning on or around April 21, 2025. These Closure Notices informed complainants that OSC would not investigate or pursue their claims. *See* Ex. F (Redacted Example of OSC Preliminary Determination); Ex. G (Redacted Example of OSC Closure Notice).

96. As discussed further below, the Probationary Directive failed to adequately explain OSC's changed position before the MSPB and ignored established statutory mandates in departing from precedent.

97. As a result of the Probationary Directive, more than 2,000 pending complaints were summarily dismissed. *See* Ex. F (citing number of complaints). Closure Notices issued in April and May 2025 disregarded factual records previously developed by OSC investigators, mischaracterized the agency's statutory jurisdiction, and foreclosed any further review, effectively immunizing the purge from scrutiny.

***Defendants Offered Arbitrary and Unlawful Justifications for the Probationary Directive and Closure Notices that Contravened OSC's Clear Statutory Mandate***

98. The Probationary Directive and the resulting Closure Notices constitute final agency actions under the APA and form the basis for this lawsuit. They are arbitrary, capricious, and contrary to law.

99. The Probationary Directive and subsequent Closure Notices purport to offer legal justifications for OSC's abrupt policy reversal. But each of OSC's explanations is poorly reasoned, factually unsupported, and legally flawed.

100. First, OSC asserted that the mass probationary terminations did not constitute a RIF because, in its view, a "RIF, properly applied, targets a position and not a person," and "[i]t is not apparent from the facts alleged that the terminated probationary employees were targeted because of a reduction in force effort targeting the positions they held. Rather, it seems they were targeted because they were probationary employees." Ex. E, at 2.

101. This rationale is both incorrect and contrary to the evidence before the agency. First, agencies did target positions. OSC itself had previously concluded as much. In its February 28, 2025, stay request to the MSPB, OSC reported:

> Through its investigation, OSC has obtained documents and interviewed multiple USDA personnel at relevant levels within that agency to gain a clear picture of how the probationary terminations at issue occurred. This evidence shows that USDA conducted a mass termination of approximately 5,900 probationary employees without consideration of their individual performance or fitness for federal employment, but rather because it did not identify their positions as 'mission-critical.'

Ex. C, at 4.

102. The Probationary Directive identifies no new information that undermines OSC's prior factual conclusion, which was based on evidence, including documents and multiple

interviews. Instead, the Probationary Directive simply states, counter to the facts previously found and with no new evidentiary record, the opposite.

103. Further, even assuming that the mass probationary terminations did not constitute a de facto RIF, OSC's conclusion that "targeting probationary employees as a class," Ex. E, at 2, removes the conduct from PPP scrutiny is legally untenable. That kind of categorical targeting still violates multiple laws and regulations that directly concern merit system principles and therefore constitutes a PPP under 5 U.S.C. § 2302(b)(12).

104. Terminating employees *en masse* based solely on probationary status conflicts with core merit system principles, including: selection and advancement should be determined solely on the basis of relative ability, knowledge, and skills, 5 U.S.C. § 2301(b)(1); employees should be retained on the basis of the adequacy of their performance, 5 U.S.C. § 2301(b)(6); and employees should be protected against arbitrary action, 5 U.S.C. § 2301(b)(8)(A).

105. As such, regardless of whether the mass terminations constituted a RIF, these terminations violated merit system principles, making them unlawful under 5 U.S.C. § 2302(b)(12).

106. Second, the Directive justified OSC's abandonment of its prior position on the grounds that because there was "no well-established precedent that the targeting of probationary employees as a class constitutes a RIF," OSC would not intervene "into this unsettled legal question" and would instead treat these terminations as "ordinary." Ex. E, at 2. But the statute does not permit OSC to decline to exercise jurisdiction because a case presents "unsettled legal question[s]." OSC's justification is legally irrelevant, and agencies cannot evade their statutory obligations simply because the underlying fact pattern is novel. Indeed, if anything, the

extraordinary nature of these mass terminations by this Administration imposed an even greater duty on OSC to investigate and enforce the law.

107. Third, the Probationary Directive claims that OPM regulations governing probationary terminations should be read "in light of existing law," specifically Chapter 75 of title 5, U.S. Code, which governs federal employees' adverse action rights, and that agencies have broad discretion in deciding whether to terminate probationary employees. *See* Ex. E, at 3.

108. Even more troubling, OSC asserted that because probationary employees have limited appeal rights to the MSPB, "[t]his weighs heavily against treating alleged violations outside of this limitation as matters in which OSC should intervene." *Id.* at 4.

109. This position is flatly inconsistent with OSC's statutory obligations. OSC's jurisdiction is not limited to cases involving MSPB appeal rights. OSC is expressly tasked with investigating violations of any civil service law, rule, or regulation, including merit system violations affecting probationers who lack direct MSPB recourse. And OSC is expressly tasked with protecting all employees—including probationary employees—from violations of merit system laws, rules, or regulations which qualify as PPPs under statute. The fact that Chapter 75 limits probationary employees' appeal rights to the MSPB has no bearing on whether OSC has an obligation to protect them from PPPs—it plainly does.

110. Another purported justification emerged in OSC's individual Closure Notices, which stated: "[e]ven if OSC could prove that the decision to terminate your probationary employment was not based on an individualized assessment of your performance, OSC is unable to pursue a claim that it was unlawful…because your termination, in the context of the government-wide effort to reduce the federal service through probationary terminations, was more

likely effected in accordance with the new administration's priorities than a decision personal to you." Ex. F.

111. This explanation lacks legal relevance and defies logic. Nowhere does OSC explain why terminations carried out pursuant to "administration priorities" are exempt from statutory and regulatory requirements.

112. To the contrary, that the terminations were carried out based on White House and OPM priorities, rather than an individualized assessment, is precisely the point—these terminations were de facto RIFs, but they did not follow RIF requirements and were therefore PPPs. And even if they were ultimately found not to be a de facto RIF, these terminations violated core merit system principles requiring that selection and advancement be determined solely on the basis of relative ability, knowledge, and skills; employees be retained on the basis of the adequacy of their performance; and employees be protected against arbitrary action. *See* 5 U.S.C. § 2301(b).

113. Moreover, in adopting the Probationary Directive and issuing the mass Closure Notices, Defendants failed to consider the reliance interests of workers who filed PPP complaints, many of whom were initially advised by OSC that their claims were meritorious.

114. In addition, by categorically excluding these probationary employees from PPP protection, OSC has taken an action that has no basis in in OSC's statutes, which define "covered employees," PPPs, and OSC's role includes investigating them.

115. Probationary employees, while lacking certain appeal rights to the MSPB, are not excluded from OSC's investigative authority. They are entitled to protection from PPPs so long as they allege conduct that falls within the 14 categories enumerated in § 2302(b) (e.g., retaliation,

discrimination, nepotism, violation of merit system principles). OSC may not categorically exclude probationary employees.

116. In fact, the MSPB has held that probationary employees subject to a RIF have appeal rights under RIF-specific procedures. *Bielomaz v. Dep't of the Navy*, 86 M.S.P.R. 276 (2006); *see also Coleman v. Fed. Deposit Ins. Corp.*, 62 M.S.PR. 187, 189-90 (1994) (holding that an appellant need not be an "employee" under § 7511 to enjoy Board appeal rights under RIF procedures at 5 C.F.R. § 351.262). These cases confirm that the scope of protection for probationers is broader than OSC now claims.

117. In short, OSC's Probationary Directive and Closure Notices not only fail to meet the APA's standard for reasoned decision-making, they affirmatively violate the agency's statutory responsibilities, and they adopt justifications that have no basis in law. They are arbitrary, capricious, contrary to law, and must be set aside under 5 U.S.C. § 706.

***Harm to Plaintiffs***

118. Plaintiffs are former federal employees who were summarily terminated during their probationary periods as part of the Administration's mass firings in February 2025.

119. OSC's abrupt reversal, issuing the unlawful Probationary Directive and related Closure Notices after receiving the complaints from Civil Servants 1-5 compounded Plaintiffs' injuries and caused them further distress.

120. Civil Servant 1's termination inflicted significant personal, professional, and financial harm. She had relocated across the country, from Illinois to Alaska, to accept NOAA's offer of a permanent position, incurring thousands of dollars in unreimbursed moving expenses, and relied on that offer that would further build her career in public service and marine conservation. The loss of her position not only left her with substantial debt but also foreclosed

her ability to apply for most Alaska state natural resource management jobs due to a statewide hiring freeze announced shortly after her termination. The abrupt end to her federal service derailed her professional trajectory in her chosen field, forced her into unrelated employment, and deprived her of the stability and advancement she reasonably expected from her career appointment. The closure of her OSC complaint left her without any avenue for redress. Until the termination, Civil Servant 1 planned to stay in the federal civil service indefinitely.

121. Civil Servant 2's termination caused significant harm. Despite a spotless record and a recent "Above Fully Successful" performance rating, he was abruptly removed from federal service, cutting short what he expected to be a long-term career at GSA. The loss of his position disrupted ongoing projects and deprived him of earned income and career advancement opportunities. As a disabled veteran who had already dedicated more than a decade to civilian federal service, he relied on the stability and retirement benefits of continued federal employment, benefits now jeopardized by the mass termination. Even after a federal court ordered his temporary reinstatement, he was placed on indefinite administrative leave, leaving him in professional limbo until GSA issued a final separation. The closure of his OSC complaint left him without any avenue for redress. Until the termination, Civil Servant 2 planned to stay in the federal civil service indefinitely.

122. Civil Servant 3 suffered harm from the effort to terminate her employment. She left a lucrative private-sector position to serve in government, accepting a substantial pay cut in reliance on the stability of federal employment and the opportunity to work for the American people. As the primary earner in her household with two young children, the attempted removal created immediate financial strain and forced her resignation once her position was effectively dismantled. The experience derailed her career in public service and deprived her of the

opportunity to continue her high-level policy work. The closure of her OSC complaint left her without any avenue for redress. Until the termination efforts, Civil Servant 3 planned to stay in the federal civil service indefinitely.

123. Civil Servant 4 relocated to accept her EPA appointment, only to be terminated weeks before conversion to permanent status. The termination disrupted her career trajectory and created economic and personal upheaval. After months in administrative limbo, she was forced to resign in order to secure stable employment back in her home state. The closure of her OSC complaint left her without any avenue for redress. Until the termination efforts, Civil Servant 4 planned to stay in the federal civil service indefinitely.

124. Civil Service 5 left a stable and well-compensated private legal career to pursue public service at the CFTC. His sudden termination, without any performance warning or negative evaluation, caused financial hardship for his family and diminished his future professional prospects. The termination interrupted ongoing enforcement matters he was handling and effectively punished him for choosing public service. The closure of his OSC complaint left him without any avenue for redress. Until the termination, Civil Servant 5 planned to stay in the federal civil service indefinitely.

125. These Plaintiffs timely filed PPP complaints with OSC, prior to the issuance of the Probationary Directive. *See, e.g.,* Ex. H (PPP complaint filed by Alden Law Group and Democracy Forward); Ex. I (second amended PPP complaint filed by Alden Law Group and Democracy Forward).

126. Under the leadership of then-Special Counsel Hampton Dellinger, OSC had acknowledged and opened investigations into their complaints.

127. However, following Dellinger's removal and the installation of politically loyal Acting Special Counsels, Plaintiffs received closure notice in April or May 2025. These notices stated that OSC would not investigate or pursue their claims, explicitly citing their probationary status as the reason for denial. As a result, Plaintiffs were foreclosed from obtaining any administrative remedy and denied any process or hearing on their claims.

128. Plaintiffs had no prior disciplinary record, had received favorable performance feedback, and were never informed of any performance concerns prior to their terminations. Their removals were abrupt and unexplained, with no opportunity to respond or to contest the action. The summary closure of their OSC complaints left them with no avenue for redress and lasting harm to their careers and livelihoods.

## CLAIMS FOR RELIEF

### Count One

### (Administrative Procedure Act - Arbitrary, Capricious)

129. Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

130. The Administrative Procedure Act requires that agency action be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

131. The Probationary Directive and the Closure Notices constitute final agency action. They reflect a complete and insufficiently reasoned reversal of OSC's prior interpretation of its statutory obligations under title 5.

132. Just weeks before the Probationary Directive, OSC had issued well-reasoned and factually detailed filings before the MSPB, arguing that the mass termination of probationary

employees were directed by the Trump Administration for the purpose of reorganizing and reducing the federal workforce, constituted an unlawful RIF, violated multiple provisions of federal civil service law, and were therefore unlawful PPPs. The MSPB granted those stay requests.

133. The Probationary Directive reversed OSC's prior legal position without any reasoned engagement with the agency's recent findings or analysis.

134. An agency that changes its position must provide a reasoned explanation and meaningfully address its prior legal conclusions and factual findings. OSC failed to do so. It did not reconcile its prior filings and offered only thin, vague, or conclusory statements in place of legal reasoning.

135. An agency policy is arbitrary and capricious where it contradicts prior factual findings, fails to consider important aspects of the problem, or is not the product of reasoned decision-making. OSC's reversal fits all these criteria.

136. OSC's about face was contrary to the evidence before the agency, including the evidence developed in the course of OSC's prior factual investigations into the probationary determinations.

137. The Probationary Directive and Closure Notices were also pretextual. They followed the President's removal of the Senate-confirmed Special Counsel and the installation of politically aligned acting officials. The timing and content of the reversal reflect a political directive, not a genuine legal reevaluation.

138. In issuing the Probationary Directive and Closure Notices, OSC relied on factors Congress did not intend it to consider, such as OSC's invocation of the limited MSPB appeal

rights of probationary employees and the Trump Administration's policy priorities, as reasons to close complaints.

139. OSC also failed to consider the reliance interests of employees who filed PPP complaints in good faith, many of whom were initially informed by OSC investigators that their claims were meritorious. These complainants had every reason to believe OSC would continue its investigation and seek relief. The agency offered no explanation for disregarding these expectations. OSC's abrupt reversal left these complainants without any opportunity for meaningful review.

140. OSC's reversal has caused direct and concrete harm to Plaintiffs, who were terminated and denied the opportunity to have their claims meaningfully investigated.

141. For these reasons, the Probationary Directive and Closure Notices must be set aside under 5 U.S.C. § 706(2)(A).

**Count Two**

**(Administrative Procedure Act – Not in Accordance with Law and Exceeding Statutory Authority)**

142. Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

143. The APA requires that a reviewing court set aside agency action that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A),(C).

144. OSC's governing statute requires it to protect "employees" from PPPs. The term "employee" includes probationary employees. *See* 5 U.S.C. §§ 1212(a), 2302(a)(2)(A), (C).

145. Yet the Probationary Directive and Closure Notices rely on a legal interpretation that excludes probationary employees from important OSC protections. The Probationary Directive argues that the probationary terminations should be understood "in light of" Chapter 75, which does not provide probationary employees with an appeal right to the MSPB. According to OSC, therefore, "[t]his weighs heavily against treated alleged violations outside of this limitation as matters in which OSC should intervene."

146. This interpretation is contrary to law, rests on an impermissibly narrow interpretation of OSC's authority, and effectively nullifies protections that Congress expressly extended to probationary employees. OSC's statute indisputably obligates it to protect *all* employees from PPPs, regardless of whether the employees have a direct right of appeal to the MSPB.

147. OSC's reversal has caused direct and concrete harm to Plaintiffs, who were terminated and denied the opportunity to have their claims meaningfully investigated.

148. The Probationary Directive and Closure Notices must be set aside under 5 U.S.C. § 706(2)(A) and (C).

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs request that this Court enter judgment in their favor and grant the following relief:

A. Declare that the Probationary Directive and associated Closure Notices are unlawful under the APA;

B. Declare that OSC's categorical exclusion of PPP complaints based on probationary status violates its statutory mandate and is unlawful;

C. Vacate the Probationary Directive and all Closure Notices issued pursuant to it;

D. Order OSC to reopen and investigate PPP complaints submitted by probationary employees in a manner consistent with its statutory obligations under title 5 and applicable law;

E. Award Plaintiffs their reasonable attorneys' fees and costs; and

F. Grant such other and further relief as the Court deems just and proper.

DATED this 10 day of September, 2025.

By: */s/* ______________________________

Michael C. Martinez (D.C. Bar No. 1686872)
Elena Goldstein (D.C. Bar No. 90034087)
Skye Perryman (D.C. Bar No. 984573)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
Telephone: (202) 448-9090
Facsimile: (202) 796-4426
mmartinez@democracyforward.org
egoldstein@democracyforward.org
sperryman@democracyforward.org

*Counsel for Plaintiffs*