## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

MORGAN A. SALADINO and CHERYL A.
HEALY,

        *Plaintiffs*,

v.

OFFICE OF SPECIAL COUNSEL and
JAMIESON GREER,

        *Defendants*.

Case No. 25-cv-3107-CJN

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT FOR FAILURE TO STATE A CLAIM AND LACK OF SUBJECT-MATTER JURISDICTION

## TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................4

    I.       Statutory Framework ................................................................................4

    II.      Factual Background ..................................................................................7

          A.      The Mass Termination of Probationary Employees ...........................7

          B.      The Office of Special Counsel's Efforts to Protect Probationary
                 Employees .........................................................................................9

          C.      The Probationary Directive .................................................................11

    III.     This Lawsuit ............................................................................................14

LEGAL STANDARD .............................................................................................................16

ARGUMENT ..........................................................................................................................17

    I.       The Probationary Directive Is Reviewable Under the Administrative
         Procedure Act...........................................................................................17

          A.      Unlike individual non-enforcement decisions, general enforcement policies
                 are subject to judicial review under the APA. ....................................17

          B.      The Probationary Directive is reviewable because it is a general enforcement
                 policy....................................................................................................20

    II.      Plaintiffs Have Article III Standing. .......................................................26

          A.      A favorable decision could remove a prohibitive barrier to Plaintiffs
                 securing redress for their unlawful terminations. ...............................28

          B.      A favorable decision could order OSC to conduct an investigation of
                 Plaintiffs' complaints, which would redress some of their injuries
                 regardless of the outcome of the investigation. .................................31

    CONCLUSION.........................................................................................................32

i

# TABLE OF AUTHORITIES

**CASES**                                                                          **Page(s)**

*Abbott Laboratories v. Gardner*,
    387 U.S. 136 (1967)..................................................................................... 17

*Adams v. Richardson*,
    480 F.2d 1159 (D.C. Cir. 1973) ............................................................. 18, 23

*AFGE v. OPM*,
    799 F. Supp. 3d 967 (N.D. Cal. 2025), *appeal docketed* No. 25-5875 (9th Cir.
    Sept. 18, 2025)................................................................................. 8, 12, 27

*America First Legal Found. v. Greer*,
    153 F.4th 1311 (D.C. Cir. 2025) ............................................................. 28, 29

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...................................................................................... 16

*Bass v. Fed. Motor Carrier Safety Admin.*,
    No. 24-cv-1874 (CRC), 2025 WL 3706653(D.D.C. Dec. 22, 2025) ............................ 16

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ...................................................................................... 16

*Bielomaz v. Dep't of Navy*,
    86 M.S.P.R. 276 (2000) ................................................................................. 11

*Bost v. Ill. State Bd. of Elections*,
    607 U.S. __, No. 24-568, 2026 WL 96707 (U.S. Jan. 14, 2026)................................... 32

*Carey v. Piphus*,
    435 U.S. 247 (1978)....................................................................................... 32

*CC Distribs., Inc. v. United States*,
    883 F.2d 146 (D.C. Cir. 1989)......................................................................... 32

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971)....................................................................................... 25

*Cmty. Nutrition Inst. v. Block*,
    698 F.2d 1239 (D.C. Cir. 1983), *rev'd on other grounds*, 467 U.S. 340 (1984) ............. 26

*Consumer Data Indus. Ass'n v. King*,
    678 F.3d 898 (10th Cir. 2012) ......................................................................... 28

*Cross v. EEOC*,
No. 1:25-cv-3702, 2025 WL 3280764 (D.D.C. Nov. 25, 2025) ...................................... 29

*Crowley Caribbean Transport, Inc. v. Pena*,
37 F.3d 671 (D.C. Cir. 1974) ...................................................................... *passim*

*Daniels v. Union Pacific R. Co.*,
480 F. Supp. 2d 191 (D.D.C. 2007) .............................................................. 16

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
140 S. Ct. 1891 (2020) ......................................................................... 17, 22

*Edison Elec. Inst. v. U.S. EPA*,
996 F.2d 326 (D.C. Cir. 1993) ................................................................... 19

*Fla. Audubon Soc. v. Bentsen*,
94 F.3d 658 (D.C. Cir. 1996) .................................................................... 26

*Frazier v. Merit Sys. Prot. Bd.*,
672 F.2d 150 (D.C. Cir. 1982) .................................................................... 5

*Heckler v. Chaney*,
470 U.S. 821 (1985) ......................................................................... *passim*

*James v. Von Zemenszky*,
284 F.3d 1310 (Fed. Cir. 2002) ................................................................. 10

*Lemon v. Geren*,
514 F.3d 1312 (D.C. Cir. 2008) ................................................................. 32

*Lincoln v. Vigil*,
508 U.S. 182 (1993) ........................................................................... 17

*Lindahl v. Off. of Pers. Mgmt.*,
470 U.S. 768 (1985) ............................................................................ 4

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ........................................................................... 22

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ....................................................................... 26, 31

*Massachusetts v. EPA*,
549 U.S. 497 (2007) ....................................................................... *passim*

*McGuffin v. SSA,*
    942 F.3d 1099 (Fed. Cir. 2019) ............................................................................... 11

*MediNatura, Inc. v. Food & Drug Admin.,*
    496 F. Supp. 3d 416 (D.D.C. 2020), *aff'd,* 998 F.3d 931 (D.C. Cir. 2021) .................... 23

*N. Am.'s Bldg. Trades Unions v. Dep't of Def.,*
    783 F. Supp. 3d 290 (D.D.C. 2025) .......................................................................... 28

*NAACP v. Trump,*
    298 F. Supp. 3d 209 (D.D.C.), *aff'd sub nom. DHS v. Regents of the Univ. of*
    *Cal.,* 140 S. Ct. 1891 (2020) ................................................................................... 22

*Nat'l Wildlife Fed'n v. EPA,*
    980 F.2d 765 (D.C. Cir. 1992) ................................................................................ 19

*Nat'l Wildlife Fed'n v. Hodel,*
    839 F.2d 694 (D.C. Cir. 1988) ............................................................................ 3, 28

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.,*
    508 U.S. 656 (1993) ............................................................................................... 32

*Orangeburg, S.C. v. FERC,*
    862 F.3d 1071 (D.C. Cir. 2017) ..................................................................... 3, 30, 31

*OSG Bulk Ships, Inc. v. United States,*
    132 F.3d 808 (D.C. Cir. 1998) ....................................................... 2, 19, 20, 21

*Shuler v. United States,*
    531 F.3d 930 (D.C. Cir. 2008) ................................................................................ 16

*Sugar Cane Growers Coop. of Fla. v. Veneman,*
    289 F.3d 89 (D.C. Cir. 2002) ............................................................................... 3, 32

*Teton Historic Aviation Found. v. U.S. Dep't of Def.,*
    785 F.3d 719 (D.C. Cir. 2015) ....................................................................... 29, 30, 32

*Weingarten v. Devos,*
    468 F. Supp. 3d 322 (D.D.C. 2020) .................................................................... 26, 28

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.,*
    586 U.S. 9 (2018) ................................................................................................... 17

*WildEarth Guardians v. Jewell,*
    738 F.3d 298 (D.C. Cir. 2013) ................................................................................ 32

## FEDERAL STATUTES

5 U.S.C. § 701.................................................................................................... 17, 24
5 U.S.C. § 706.................................................................................................... 15, 24
5 U.S.C. § 1201-1222 ................................................................................................. 5
5 U.S.C. § 1202 .......................................................................................................... 7
5 U.S.C. § 1204 .......................................................................................................... 5
5 U.S.C. § 1211 ................................................................................................. 6, 7, 11
5 U.S.C. § 1212 ..................................................................................................... 6, 26
5 U.S.C. § 1213 .......................................................................................................... 6
5 U.S.C. § 1214 ....................................................................................................... 6, 9
5 U.S.C. § 1215 .......................................................................................................... 6
5 U.S.C. § 1216 ..................................................................................................... 6, 10
5 U.S.C. § 2301 .............................................................................................. 5, 10, 13
5 U.S.C. § 2302 .................................................................................................. *passim*
5 U.S.C. § 3502 ........................................................................................................ 10
5 U.S.C. § 7511(a)(1)................................................................................................. 6
5.U.S.C. § 7513(d) ..................................................................................................... 6

Civil Service Reform Act (CSRA) of 1978, Pub. L. No. 95-454, 92 Stat. 1111(1978) ................. 4

The Pendleton Act of 1883, Pub. L. No. 16, 22 Stat. 403 (1883).................................... 4

Whistleblower Protection Act, Pub. L. No. 101-12, 103 Stat. 16 (1989) ......................... 6

## FEDERAL RULES

Fed. R. Civ. P. Rule 12(b)(6)............................................................................ 16, 25

Fed. R. Civ. P. Rule 12(b)(1)............................................................................ 16, 25

## FEDERAL REGULATIONS

5 C.F.R. § 315.803(a) (2025)............................................................................. 8, 11
5 C.F.R. § 315.804(a) (2025)................................................................................... 8
5 C.F.R. § 351.501-506 .......................................................................................... 10

## OTHER AUTHORITIES

Brian D. Fong, *Whistleblower Protection and the Office of Special Counsel: The
Development of Reprisal Law in the 1980's*,
40 Am. U. L. Rev. 1015 (1991) .................................................................... 5

13A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice &
Procedure § 3531.5 (3d ed. 2008)................................................................ 31

S. Rep. No. 95-969 (1978) .............................................................................................................. 7

# INTRODUCTION

As soon as President Trump returned to power, he initiated a campaign to purge the federal government of nonpartisan civil servants. As part of that campaign, the Trump Administration swiftly fired thousands of probationary employees—federal workers in their first or second year on the job—from agencies across the government. As soon as the terminations were underway, terminated probationary employees began submitting complaints to the Office of Special Counsel (OSC), the independent watchdog agency that Congress intended to help protect the merit-based civil service. OSC immediately began filing requests asking the Merit Systems Protection Board (MSPB) to stay the terminations. The stay requests explained that the mass termination of probationary employees appeared to violate federal personnel laws, including the regulations that govern reductions in force (RIFs). MSPB granted OSC's stay requests, found reasonable grounds to believe that the terminations were prohibited personnel practices, and granted preliminary relief to the covered probationary employees.

While OSC's efforts to protect probationary employees were underway, the Trump Administration intervened to defang the agency. The President removed Special Counsel Hampton Dellinger, without cause, even though his five-year term had not expired and even though the statute provided that he could be fired only for inefficiency, neglect of duty, or malfeasance. Dellinger initially challenged his termination in court, but he eventually stepped aside. Dellinger's removal cleared the way for President Trump to appoint new political leadership at OSC and wrest control of the once independent agency. OSC's new leadership wasted no time in repudiating the agency's prior efforts to protect probationary employees from unlawful terminations. On April 8, 2025, the agency issued a new policy pertaining to probationary employees, referred to hereinafter as the "Probationary Directive." The Probationary Directive abandoned OSC's prior position that

the mass termination of probationary employees was unlawful and directed OSC to close its investigations into the terminations.

Plaintiffs Morgan Saladino and Cheryl Healy are two former federal employees who were fired as part of the Trump Administration's purge of probationary employees and who submitted complaints to OSC in hopes that the agency would be able to halt their unlawful terminations. Plaintiffs filed this lawsuit challenging the Probationary Directive under the Administrative Procedure Act (APA) as both unlawful and arbitrary and capricious. Plaintiffs ask the court to vacate the Probationary Directive, order OSC to reopen the complaints filed by probationary employees and order it to investigate those complaints in a manner consistent with the law.

Defendants moved to dismiss. Rather than defend OSC's conduct on the merits, Defendants instead make two threshold arguments. First, they claim that the Probationary Directive is an unreviewable exercise of enforcement discretion. Second, they contest standing by arguing that a court order would not redress Plaintiffs' injuries. Neither argument holds up.

Start with whether the Probationary Directive is reviewable under the APA. Defendants' only argument on this front is that OSC has unbridled enforcement discretion and the exercise of that discretion is subject to a presumption of unreviewability under *Heckler v. Chaney*, 470 U.S. 821 (1985). But *Chaney* applies only to an individual decision not to seek enforcement in the context of a particular case. *Chaney* expressly does not reach the question of whether broader policy statements pertaining to agency enforcement are reviewable under the APA. And to that issue, the D.C. Circuit has spoken clearly. It has repeatedly recognized that, unlike a "single-shot non-enforcement decision," a "general enforcement policy is subject to review." *OSG Bulk Ships, Inc. v. United States*, 132 F.3d 808, 812 (D.C. Cir. 1998) (quoting *Crowley Caribbean Transport, Inc. v. Pena,* 37 F.3d 671, 676 (D.C. Cir. 1974)). Defendants pointedly do not address (or even

cite) any of those cases in a jurisdiction where they are controlling. And the Probationary Directive bears all the hallmarks of a reviewable policy statement and none of the characteristics of the sort of ad hoc enforcement decisions that are unreviewable under *Chaney*.

On standing, Defendants contend that Plaintiffs have failed to show redressability because even if they prevail in this litigation OSC will continue to have unreviewable enforcement discretion and therefore cannot be compelled to seek relief on Plaintiffs' behalf. In other words, OSC contends that whatever this Court may do, nothing can force it to protect Plaintiffs' civil-service rights. But OSC's potential obstinacy in the face of a court order clarifying its legal obligations does not defeat this Court's jurisdiction. For one, a plaintiff "need not show to a certainty that a favorable decision will redress his injury." *Nat'l Wildlife Fed'n v. Hodel*, 839 F.2d 694, 705 (D.C. Cir. 1988). It is enough to show that a favorable decision "would diminish the obstacles" to the plaintiff securing relief even if other obstacles persist. *Orangeburg, S.C. v. FERC*, 862 F.3d 1071, 1080 (D.C. Cir. 2017). Here, there is no dispute that Plaintiffs complaints were dismissed because of the Probationary Directive. If this Court were to vacate that policy, clarify OSC's statutory obligations, and order OSC to reopen and investigate Plaintiffs' complaints, then a significant obstacle to Plaintiffs securing legal redress for their wrongful terminations would be lifted. That is all that is required to establish this Court's jurisdiction.

Moreover, Plaintiffs are entitled to have their complaints investigated and OSC's refusal to investigate their complaints denies them a fair process. A court order could require OSC to conduct an investigation in accordance with the law, and such an order would remediate an important procedural injury regardless of whether the "the substantive result would have been altered." *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007) (quoting *Sugar Cane Growers Coop. of Fla. v. Veneman,* 289 F.3d 89, 94–95 (D.C. Cir. 2002)).

In short, the Court has jurisdiction to hear a challenge to the Probationary Directive, which as a general enforcement policy is reviewable under the APA. The Court should thus deny the motion to dismiss and allow this litigation to proceed to the merits.

## BACKGROUND

### I.    Statutory Framework

For more than 140 years, merit principles have been essential to the efficient and continuous operation of the career civil service. Am. Compl. ¶ 29, ECF No. 14. Before that, a "spoils system" reigned, and presidents could fill federal jobs with political allies. *Id.* ¶ 30. Under this patronage system, positions were not filled based on qualifications or merit, and when presidential administrations changed, employees were regularly dismissed from government regardless of how well they had performed their duties. *Id.* The Pendleton Act of 1883, Pub. L. No. 16, 22 Stat. 403, ended the spoils system and laid the foundation for today's civil service. Subsequent congressional actions have consistently moved the federal civil service in one direction: toward greater protections and political insulation for members of the civil service. Am. Compl. ¶¶ 31-32.

Against that backdrop, in 1978, Congress passed the Civil Service Reform Act (CSRA) of 1978, Pub. L. No. 95-454, 92 Stat. 1111. The CSRA created a new framework for the modern civil service and provided clearer protections for career federal employees. *See generally Lindahl v. Off. of Pers. Mgmt.,* 470 U.S. 768, 773 (1985). A central goal of the CSRA was to ensure meaningful review of adverse personnel actions and ensure that "[e]mployees are . . . protected against arbitrary action, personal favoritism, and from partisan political coercion." S. Rep. No.95-969, at 19 (1978), *reprinted in* 1978 U.S.C.C.A.N. 2723, 2741. It was designed to ensure that federal employment decisions are based on merit, not political loyalty, patronage, or personal favoritism. CSRA § 101, 92 Stat. at 1114; *see also* Bruce D. Fong, *Whistleblower Protection and*

*the Office of Special Counsel: The Development of Reprisal Law in the 1980's*, 40 Am. U. L. Rev. 1015, 1017-18 (1991). In the CSRA, Congress both established the substantive principles to guide the merit system *and* created the independent agencies tasked with safeguarding those principles.

*Merit systems principles.* The CSRA provides that every federal agency must be run in accordance with nine "merit system principles." 5 U.S.C. § 2301. Those principles include, for example, and as relevant here, that "selection and advancement should be determined solely on the basis of relative ability, knowledge, and skills," *id.* § 2301(b)(1); that federal employees "should be retained on the basis of the adequacy of their performance," *id.* § 2301(b)(6); and that federal employees should be "protected against arbitrary action, personal favoritism, or coercion for partisan political purposes," *id.* § 2301(b)(8)(A).

*Prohibited personnel practices.* The CSRA also established certain "prohibited personnel practices," commonly referred to as "PPPs," which are employment-related activities that are banned in the federal workplace because they violate merit system principles *See id.* § 2302(b). Some examples of prohibited personnel practices include discrimination against an employee on the basis of protected characteristics, *id.* § 2302(b)(1), and reprisal against an employee for protected disclosures, *id.* § 2302(b)(8). As pertinent to this lawsuit, under 5 U.S.C. § 2302(b)(12), it is a prohibited personnel practice to take any personnel action that "violates any law, rule, or regulation implementing, or directly concerning, the merit systems principles."

*Merit Systems Protection Board.* The CSRA also created the Merit Systems Protection Board (MSPB). 5 U.S.C. §§ 1201–1222. The MSPB is an adjudicatory body consisting of three members who hear and decide appeals from federal employees regarding adverse personnel actions. 5 U.S.C. § 1204(a)(1); *see also Frazier v. Merit Sys. Prot. Bd.*, 672 F.2d 150 (D.C. Cir. 1982). Most federal employees earn MSPB appeal rights after one or two years of service, meaning

they can challenge certain adverse actions, including removals, to the MSPB. *See* 5 U.S.C. §§ 7511(a)(1); 7513(d). By contrast, probationary employees who are in their first or second year of service generally cannot appeal adverse actions to the MSPB.

*The Office of Special Counsel.* In the CSRA, Congress also created the Special Counsel, initially as part of the MSPB, and vested it with the authority to investigate allegations of prohibited personnel practices. 5 U.S.C. § 1211. Several years later, in 1989, through the Whistleblower Protection Act, Pub. L. No. 101-12, 103 Stat. 16 (1989), Congress strengthened the Special Counsel by separating it from the MSPB and creating the Office of Special Counsel (OSC) as an independent agency. Am. Compl. ¶ 37.

Though probationary employees cannot directly appeal adverse actions to the MSPB, they indisputably are covered by OSC's statutory mandate; among other duties, OSC "shall…protect employees, former employees, and applicants for employment from prohibited personnel practices." 5 U.S.C. § 1212(a)(1); "receive and investigate allegations of prohibited personnel practices," *id.* § 1212(a)(2); and "conduct an investigation of any allegation concerning … activities prohibited by any civil service law, rule, or regulation, including any activity relating to political intrusion in personnel decisionmaking," *id.* § 1216(a)(4).

To carry out these statutory requirements, OSC possesses broad investigative and enforcement powers, including the ability to: compel testimony under oath; issue subpoenas; obtain documents; take depositions; receive evidence; bring corrective action petitions before the MSPB; recommend or initiate disciplinary action; and transmit disclosures of legal violations, gross mismanagement, abuses of authority, or threats to public safety to agency heads or the Attorney General. *See* 5 U.S.C. §§ 1212(b), 1213, 1214, 1215. As relevant here, OSC also has statutory authority under 5 U.S.C. § 1214(b)(1)(A)(i) to request a stay of a personnel action from

6

the MSPB where it has reasonable grounds to believe that an agency action was taken as a result of a prohibited personnel practice.

The independence of both the MSPB and OSC were foundational to Congress' design: they were established to be "independent of any control or direction by the President." S. Rep. No. 95-969, at 24 (1978). The CSRA explicitly provides that the MSPB's members and the Special Counsel can be removed by the President only for "inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. §§ 1202(d), 1211(b).

## II.    Factual Background

### A.    The Mass Termination of Probationary Employees

From the outset, the Trump Administration has made clear its intent to rewrite the rules of the federal bureaucracy in order to diminish the protections afforded to the career civil service and to ensure the federal workforce is filled with people loyal to the President's political agenda. *See* Am. Compl. ¶¶ 47–60. Consistent with this objective, the Trump Administration has tried to strip civil service protections from a wide swath of career civil servants, executed significant reductions in force, retaliated against civil servants who raise concerns about wrongdoing, and imposed a hiring plan that allows the administration to screen applicants based on their loyalty to the President's policy agenda. *Id.* ¶¶ 51-54. And all of this is happening at the same time that the Trump Administration is taking steps to undermine the independence of the institutions that Congress created to protect the nonpartisan civil services. It has removed a member of the MSPB denying the Board a quorum, *id.* ¶ 56, fired multiple inspectors general, *id.* ¶ 57, as most relevant here explained more fully below, it has appointed new, politically aligned leadership at OSC, *id.* ¶¶ 81-85.

The Trump Administration's overhaul of the civil service has extended to probationary employees. Shortly after the election, the Office of Personnel Management (OPM) issued guidance

directing federal agencies to provide OPM with a complete list of all probationary employees and to promptly determine whether there was any basis to retain the probationary employees. *Id.* ¶ 61. Shortly thereafter, the President issued an executive order directing federal agencies to undertake preparations to initiate large-scale reductions in force with the goal of massively reducing the size of the federal work force. *Id.* ¶ 62. Between February 12 and 14, 2025, the Trump Administration initiated a sweeping government-wide effort to terminate thousands of probationary employees. *Id.* ¶ 63. This effort was centrally directed by OPM. *Id.* ¶¶ 67-70; *see also AFGE v. OPM,* , 799 F. Supp. 3d 967, 971 (N.D. Cal. 2025), appeal docketed No. 25-5875 (9th Cir. Sept. 18, 2025) ("In early 2025, the Office of Personnel Management directed agencies across the federal government to terminate their probationary employees *en masse*, apart from the highest performers in 'mission critical' roles and those within the scope of an OPM-approved exception"). The culling took place across the federal government—at the Departments of Energy, Veterans Affairs, Education, Agriculture, and Interior, among many others—and followed terminations of scores of probationary workers at the Consumer Financial Protection Bureau and the Small Business Administration. *Id.*

At the time, OPM regulations provided that a probationary employee in the competitive service could be terminated if "the employee fails to demonstrate fully his or her qualifications for continued employment," 5 C.F.R. § 315.803(a) (2025), and, further, "when an agency decides to terminate an employee…because his work performance or conduct…fails to demonstrate his fitness or his qualifications for continued employment," the agency shall notify the employee in writing, which "shall, as a minimum, consist of the agency's conclusions as to the inadequacies of [the employee's] performance or conduct." 5 C.F.R. § 315.804(a) (2025). But these *en masse* probationary terminations were executed without any individualized assessment of performance,

conduct, or fitness for continued employment and many of the termination notices were riddled with errors. Am. Compl. ¶ 63.

**B.      The Office of Special Counsel's Efforts to Protect Probationary Employees**

As soon as the mass termination of probationary employees began, probationary employees began filing complaints with OSC. *Id.* ¶ 64. Those complaints alleged that the terminations were unlawful and constituted prohibited personnel practices. *Id.* Many of the complaints requested that OSC exercise its authority under 5 U.S.C. § 1214 to request that MSPB stay the terminations.

On February 21, 2025, OSC filed a stay request with the MSPB on behalf of five federal employees, which the MSPB granted. *See* Am. Compl., Ex. A, ECF No. 14-1 (Feb. 21, 2025, OSC Stay Request); Am. Compl., Ex. B, ECF No. 14-2 (Feb. 28, 2025, MSPB Order on Stay Request). A few days later, on February 28, 2025, OSC expanded its effort and successfully obtained a broader stay of over 5,000 probationary terminations at the U.S. Department of Agriculture (USDA). *See* Am. Compl., Ex. C, ECF No. 14-3 (Feb. 28, 2025, OSC Stay Request); Am. Compl., Ex. D, ECF No. 14-4 (Mar. 5, 2025, MSPB Order on Stay Request).

In its petitions, OSC explained that its investigations revealed that the mass terminations of probationary employees were not based on an individualized assessment of the employees' conduct or performance, but instead were in fact unlawful RIFs, conducted as part of the Trump Administration's efforts to reduce and reorganize the federal workforce. Am. Compl. ¶ 66. OSC argued that *en masse* probationary terminations were part of a centralized Trump Administration effort with OPM not only directing agencies to terminate their probationary employees but also instructing them how to do so. *Id.* ¶¶ 67–70. Ultimately, OSC concluded that this effort to cull the federal workforce of probationary employees was likely unlawful because if an agency wishes to terminate probationary employees as part of a restructuring or downsizing, it must follow the RIF procedures. *Id.* ¶¶ 74–79.

Specifically, in its petition pertaining to probationary terminations at USDA, OSC argued that the terminations violated 5 U.S.C. § 2302(b)(12), which provides that it is a prohibited personnel practice for an agency to "violate[] any law, rule, or regulation implementing, or directly concerning, the merit system principles contained in [5 U.S.C. § 2301]." ECF No. 14-3 at 8. OSC concluded that mass probationary terminations violated various civil service regulations governing RIFS and thereby constitute violations of 5 U.S.C. § 2302(b)(12) and 5 U.S.C. §1216(a)(4). ECF No. 14-3 at 9.

Importantly, OSC explained that any agency must comply with the RIF regulations when it is terminating an employee for "lack of work, shortage of funds, and reorganization." *Id.* at 10. According to OSC, "[e]ach agency has the right to decide whether a RIF is necessary," but "agencies do not have discretion to bypass RIF procedures when they are reorganizing or reducing the size of components based on lack of work or budgetary concerns." *Id.* at 11 (citing *James v. Von Zemenszky*, 284 F.3d 1310, 1321 (Fed. Cir. 2002)). Moreover, OSC's investigation revealed that the mass probationary terminations at USDA were enacted not to eliminate poor performers but rather as part of an effort to restructure and downsize the agency, or in other words, a RIF. *Id.* at 13.

In its petition, OSC explained that the RIF procedures "provide for an orderly process of determining which employees are retained rather than separated and ensuring that those decisions are made according to merit-based factors." *Id.* (citing 5 U.S.C. § 3502; 5 C.F.R. §§ 351.501-506). Had USDA followed those procedures, many probationary employees likely would have been able to keep their jobs or to be reassigned to new positions. *Id.* RIF procedures also provide employees a variety of other protections including a right to sixty days of notice prior to termination and the right to appeal a RIF determination to the MSPB. *Id.* at 14. The MSPB's jurisdiction to hear a RIF

appeal applies to federal employees regardless of probationary status. *Id.* (citing *Bielomaz v. Dep't of Navy*, 86 M.S.P.R. 276, 280 (2000)). The USDA probationary employees who were terminated were deprived of these and other important protections, and OSC concluded that the failure to adhere to the required RIF procedures constituted a prohibited personnel practice.

Separately, OSC also argued that the terminations violated other regulations that protect probationary employees in the competitive service. Specifically, at the time of the termination, 5 C.F.R. § 315.803 (2025) stated that agencies should utilize the probationary period "to determine the fitness of the employee" and should terminate the employee "if the employee fails to demonstrate fully his or her qualifications for continued employment." ECF No. 14-3 at 15. In short, to terminate a probationary employee, an agency "must honestly be dissatisfied with the probationer's conduct or performance after giving him a fair trial on the job." *McGuffin v. SSA*, 942 F.3d 1099, 1102 (Fed. Cir. 2019) (cleaned up. OSC concluded that the termination of competitive-service probationary employee did not comply with the rule because the administration fired "probationary employees *en masse* to accomplish organizational objectives and not due to the performance or conduct of individual probationers." ECF No. 14-3 at 17.

In sum, OSC's stay petitions thoroughly explained the factual and legal bases for the agency's determination that the mass termination of probationary employees constitutes an unlawful RIF and is therefore a prohibited personnel practice. That reasoning was persuasive to MSPB, which granted both petitions.

### C.    The Probationary Directive

OSC's work to carry out its statutory mandate to protect probationary employees from PPPs was short-lived. In February 2025, President Trump removed Special Counsel Dellinger from his position as head of OSC. Am. Compl. ¶¶ 81-82. Dellinger challenged his removal in federal court. *Id.* ¶ 82. He argued that under the for-cause removal provision in the CSRA, *see* 5

U.S.C. § 1211(b), he could only be terminated for inefficiency, neglect of duty, or malfeasance. Am. Compl. ¶¶ 81-82. But Dellinger ultimately withdrew his legal challenge and vacated his position as Special Counsel. *Id.* ¶ 82. Following Dellinger's departure, President Trump installed a succession of politically aligned Acting Special Counsels. *Id.* ¶¶ 83-85. OSC is currently led by Acting Special Counsel Jamieson Greer who also serves as a senior White House Official and the U.S. Trade Representative. *Id.* ¶ 83.

The change in leadership at OSC resulted in immediate and dramatic changes in the agency's legal positions. *Id.* ¶ 86; *see also AFGE v. OPM*, 799 F. Supp. 3d at 987 (N.D. Cal. 2025), *appeal docketed* No. 25-5875 (9th Cir. Sept. 18, 2025) (OSC "ha[s] started working for the other side."). As pertinent here, on April 8, 2025, OSC issued the Probationary Directive, which instructed the agency's staff to close investigations into probationary terminations. *See* Am. Compl., Ex. E, ECF No. 14-5 (Apr. 8, 2025, OSC Probationary Directive). The Probationary Directive was issued by a new political appointee at OSC, Senior Counsel Charles Baldis, acting under delegated authority from Acting Special Counsel Greer. Am. Compl. ¶ 87.

The Directive explains that OSC received more than 2,000 complaints from federal employees alleging that their probationary terminations were unlawful. ECF No. 14-5 at 2. According to the Directive, almost all of them made the same allegations that OSC itself had advanced a few days prior: that the probationary terminations were *de facto* RIFs that failed to follow the RIF procedures. *Id.* at 23. But rather than following its prior and reasoned analysis, OSC's Directive reflected an abrupt shift in the agency's position, stating that "any previous position taken by OSC in filings before the Merit System Protection Board (MSPB)" pertaining to probationary terminations "are repudiated" and that "these terminations" as a matter of law "do not constitute prohibited personnel practices." *Id.* at 2.

The Probationary Directive purports to offer legal justifications for OSC's abrupt policy reversal, but each of OSC's explanations is poorly reasoned, factually unsupported, and legally flawed. For one, the Probationary Directive reasons that the probationary terminations were not RIFS because they targeted specific people and "a RIF properly applied targets a position and not a person." *Id.* at 3. This rationale is both incorrect and contrary to the evidence before the agency. As an initial matter, agencies *did* target positions—OSC itself had concluded as much in its February 28, 2025 stay request to the MSPB. ECF No. 14-3 at 4 ("This evidence shows that USDA conducted a mass termination of approximately 5,900 probationary employees…because it did not identify their positions as 'mission-critical'"). But even if the terminations did target people and not positions, this too plainly constitutes a prohibited personnel practice because it violates multiple merit system principles. *See* 5 U.S.C. § 2302(b)(12); *see also id.* § 2301(b)(1), (6), (8)(A) (merit system principles violated by targeting of employees for termination).

Moreover, the Directive claims that protections for probationary employees should be read "in light of existing law," and that because probationary employees, unlike employees who have completed one or two years of federal service, cannot directly challenge their terminations with the MSPB, "[t]his weighs heavily against treating alleged violations outside of this limitation as matters in which OSC should intervene." ECF No. 14-5 at 45. This position, however, is directly contrary to OSC's statutory mandate. OSC is expressly tasked with protecting all employees, not just those who have the right to challenge their terminations at the MSPB, from prohibited personnel practices. While the agency is afforded discretion to determine whether to seek relief on behalf of any particular employee, nothing in the statute gives the ability to *categorically* refuse to investigate complaints submitted by an entire class of employees.

OSC's decision to repudiate its statutory obligation to probationary employees was extremely consequential for those probationary employees with pending complaints. The Directive directs that OSC's ordinary investigative procedures will no longer apply to complaints submitted by terminated probationary employees. *Id.* at 5. Instead, the Directive instructs OSC personnel to determine whether the probationary employee's complaint presents the legal issues addressed in the memorandum—e.g., argues that mass probationary terminations are *de facto* RIFs. *Id.* If so, then the investigator is required to "terminate the investigation" on the basis that there are no reasonable grounds to believe that a PPP occurred." *Id.* The OSC sent more than 2,000 "Closure Notices" to probationary employees whose complaints were closed pursuant to the Directive. Am. Compl. ¶ 10; Am. Compl, Ex. G, ECF No. 14-7 (May 13, 2025, OSC Closure Notice).

## III.    This Lawsuit

On September 10, 2025, five former federal probationary employees who were terminated by the Trump Administration brought this lawsuit to challenge the lawfulness of Probationary Directive. Compl., ECF No. 1. They also moved to proceed under pseudonym. Mot. to Proceed Under Pseudonym, ECF No. 5. On October 6, 2025, Chief Judge Boasberg denied the motion to proceed under pseudonym. ECF No. 12. On October 20, 2025, Plaintiffs Morgan Saladino and Cheryl Healey filed an Amended Complaint proceeding under their legal names. Am. Compl., ECF No. 14.

Plaintiff Morgan Saladino was previously a biologist in the Anchorage Field Office of the National Oceanic and Atmospheric Administration, which is part of the Department of Commerce. Am. Compl. ¶ 14. Plaintiff Cheryl Healey was formerly a policy advisor at the Administration for Children and Families, which is part of the Department of Health and Human Services. *Id.* ¶ 15. Neither Saladino nor Healey ever received any negative performance feedback during their tenures in the federal government. *Id.* ¶¶ 14–15. Nonetheless, in February 2025, both Saladino and Healey

were fired by their respective agencies. *Id.* Both were probationary employees at the time they were terminated. *Id.* Saladino and Healey both filed complaints with OSC alleging that their terminations were PPPs under 5 U.S.C. § 2302. *Id.* OSC acknowledged receipt of their complaints but later, in May 2025, closed the complaints pursuant to the Probationary Directive. *Id.*

Plaintiffs Saladino and Healey's Amended Complaint names the Office of Special Counsel and Jamieson Greer, in his official capacity as Acting Director of OSC, as Defendants. It asserts two causes of action under the APA. The first cause of action alleges that the Probationary Directive is arbitrary and capricious in violation of U.S.C. § 706(2)(A) because it repudiates OSC's prior position with regard to the lawfulness of mass probationary terminations without meaningfully addressing the agency's prior reasoning. *Id.* ¶¶ 126-30. The Probationary Directive is also arbitrary and capricious insofar that its legal reasoning is pretextual, *id.* ¶ 131, it relies on factors not intended by Congress, *id.* ¶ 132, and fails to account for the reliance interests of probationary employees, *id.* ¶ 133. The second cause of action alleges that the Probationary Directive violates 5 U.S.C. § 706(2)(A), (C) because it is "not in accordance with the law" and is "in excess of statutory jurisdiction, authority, or limitations." Am. Compl. ¶¶ 136-42. By categorically excluding probationary employees from PPP protections, OSC has acted contrary to its statute, which mandates that OSC shall protect all employees, including probationary employees, from prohibited personnel practices.

Plaintiffs seek a declaration that the Probationary Directive and Closure Notices are unlawful under the APA; a declaration that OSC's categorical exclusion of complaints based on probationary violates its statutory mandate and is unlawful; vacatur of the Probationary Directive and Closure Notices; and an order requiring OSC to reopen and investigate complaints submitted by probationary employees. *Id.* at 37 (Request for Relief). .

On January 7, 2026, Defendants moved to dismiss. Mot. to Dismiss, ECF No. 21. The motion to dismiss makes two arguments. First, it argues that the Probationary Directive is subject to the "presumption of unreviewability" because Plaintiffs challenge "OSC's decisions not to take enforcement action." Defs.' Mem. in Supp. of Mot. to Dismiss ("Defs.' Mem."), ECF No. 21-1 at 19. Second, it argues that Plaintiffs lack Article III standing because their injuries are not redressable by an order of the Court. Specifically, Defendants contend that because "OSC possesses unreviewable discretion to decide the cases in which to pursue enforcement, Plaintiffs can only speculate that an order from the Court that OSC reopen their investigations would result in any concrete relief." *Id*. at 25.

## LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim made under Federal Rule of Civil Procedure 12(b)(6), the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim is facially plausible when the pleaded factual content 'allows the court to draw the reasonable inference that defendant is liable for the misconduct alleged.'" *Bass v. Fed. Motor Carrier Safety Admin*., No. 24-cv-1874-CRC, 2025 WL 3706653, at *3 (D.D.C. Dec. 22, 2025) (quoting *Iqbal*, 556 U.S. at 678).

To survive a motion to dismiss for lack of subject-matter jurisdiction made under Federal Rule of Civil Procedure 12(b)(1), "a plaintiff 'bears the burden of demonstrating' that the [c]ourt possesses subject-matter jurisdiction over the case." *Id.* (quoting *Shuler v. United States*, 531 F.3d 930, 932 (D.C. Cir. 2008)). The "nonmoving party is entitled to all reasonable inferences." *Id.* (quoting *Daniels v. Union Pacific R. Co.*, 480 F. Supp. 2d 191, 194 (D.D.C. 2007)). The court "may consider documents outside the pleadings to assure itself that it has jurisdiction." *Id.*

**ARGUMENT**

I.    **The Probationary Directive Is Reviewable Under the Administrative Procedure Act.**

Defendants argue that Plaintiffs have failed to state a claim because the exercise of enforcement discretion is presumptively unreviewable under *Heckler v. Chaney*, 470 U.S. 821 (1985). But just because enforcement discretion is *presumptively* unreviewable does not mean that it is *always* unreviewable. In their motion to dismiss, Defendants fail to discuss the circumstances under which an agency's enforcement decisions are subject to review under the APA, nor do they even acknowledge that the *Chaney* presumption of unreviewability is subject to exceptions. As the D.C, Circuit has made clear, *Chaney* is subject to a well-established exception that holds that general enforcement policies are reviewable under the APA. And the Probationary Directive is precisely such a policy.

A.    **Unlike individual non-enforcement decisions, general enforcement policies are subject to judicial review under the APA.**

The APA creates a "basic presumption of judicial review" of agency action. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020) (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140 (1967)). That presumption can be rebutted by showing that the "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). But to "honor the presumption of review" Congress established in enacting the APA, courts "read the exception in § 701(a)(2) quite narrowly, restricting it to 'those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018) (quoting *Lincoln v. Vigil,* 508 U.S. 182, 191 (1993)).

Defendants invoke the presumption set forth in *Chaney* that an agency's enforcement decisions are unreviewable. But *Chaney* does not hold that all agency decision-making pertaining

to the exercise of enforcement authority is unreviewable. The Court in *Chaney* limited its discussion to "individual decisions" by the agency "not to take enforcement action." *Chaney*, 470 U.S. at 838 (Brennan, J. concurring). The Court expressly reserved the question of whether broader policies that govern how an agency exercises its enforcement authority are reviewable under the APA. The Court did not resolve the reviewability of "a refusal by the agency to institute proceedings based solely on the belief that it lack[ed] jurisdiction." *Chaney*, 470 U.S. at 833 n.4. Nor did it resolve the question of reviewability when "the agency has 'consciously and expressly adopted a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities." *Id.* (citing *Adams v. Richardson,* 480 F.2d 1159, 1162 (D.C. Cir. 1973) (en banc)).

While *Chaney* did not address the reviewability of general enforcement policies, the D.C. Circuit has since clarified that such policies may be subject to judicial review. In *Crowley Caribbean Transp., Inc. v. Peña*, 37 F.3d 671 (D.C. Cir. 1994), the court held that a "universal policy statement" is reviewable under the APA. *Id.* at 676. In that case, the Maritime Administration authorized the Lykes Brothers Steamship Company to operate on a route between the United States and Panama. A competitor brought suit arguing that Lykes Brothers was barred from serving the Panama route under the Merchant Marine Act (which imposes various restrictions on subsidized freight carriers). The D.C. Circuit affirmed dismissal of the case because "the Maritime Administrator's *single-shot* non-enforcement decision" was unreviewable under *Chaney*. *Id.*. But the court was careful to distinguish between "an agency's decision to decline enforcement in the context of an individual case," which is unreviewable, and "an agency's statement of a *general enforcement policy*," which is reviewable. *Id.* at 676.

18

In making this distinction, the *Crowley* court relied on both precedent and first principles. With regard to precedent, the court drew on a line of cases in which it had previously allowed judicial review of agency enforcement policies. *See Edison Elec. Inst. v. U.S. EPA*, 996 F.2d 326, 333 (D.C. Cir. 1993) (reviewing an EPA enforcement policy because it involved "substantive requirements of the law" rather than a "discretionary judgment[s]"); *Nat'l Wildlife Fed'n v. EPA*, 980 F.2d 765, 773 (D.C. Cir. 1992) (holding that the presumption of unreviewability is "inapplicable" to facial challenges regarding an agency's "statutory interpretation.").

Turning to first principles, the *Crowley* court found there to be "ample reasons" for distinguishing between "single-shot" non-enforcement decisions and general enforcement policies. 37 F.3d at 676-77. First, "enforcement policies are abstracted from the particular combinations of facts the agency would encounter in individual enforcement proceedings." *Id.* at 677. Policy statements "are more likely to be direct interpretations of the commands of the substantive statute" rather than the "mingled assessments of fact, policy, and law that drive an individual enforcement decision" and are "peculiarly within the agency's expertise and discretion." *Id.* Second, a broad non-enforcement policy poses the risk that an agency has "has consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities," a scenario that *Chaney* indicated would likely trigger judicial review. *Crowley,* 37 F.3d at 677 (quoting *Chaney,* 470 U.S. at 833 n. 4). Third, an agency generally provides "a clearer (and more easily reviewable) statement of its reasons" when articulating a broad policy, whereas individual enforcement decisions "tend to be cursory, ad hoc, or post hoc." *Id.*

In *OSG Bulk Ships, Inc. v. United States*, 132 F.3d 808 (D.C. Cir. 1998), the D.C. Circuit applied the principles it previously enunciated in *Crowley* and again affirmed that *Chaney* does

not shield an agency's general enforcement policies from judicial review. In that case, the Maritime Administration adopted a policy of allowing certain ships built with federal subsidies to operate in domestic commerce notwithstanding statutory language restricting their domestic usage. When a shipbuilding company unable to compete with subsidized competition brought suit, the agency argued that the case should be dismissed under *Chaney*. It insisted that whether and how the Maritime Administration enforced the Merchant Marine Act was a matter of agency discretion immune to judicial review. *OSG Bulk Ships*, 132 F.3d at 812. The D.C. Circuit made quick work of that argument. It acknowledged that under *Chaney* "a single-shot non-enforcement decision" is unreviewable but held—relying on *Crowley*—that "an agency's adoption of a general enforcement policy is subject to review." *Id.*

Defendants' motion to dismiss ignores this controlling precedent. Their argument that the Probationary Directive is not reviewable rests entirely on the faulty premise that *Chaney* shields every agency action involving the exercise of enforcement authority from review. But *Chaney*'s reach is narrower. As *Crowley* and *OSG Bulk Ships* make clear, the presumption of unreviewability applies only to "*single-shot* non-enforcement decision[s]." Because the Probationary Directive is a general enforcement policy rather than an *ad hoc* exercise of discretion, it lies beyond *Chaney*'s reach and is subject to judicial review under the APA.

## B.     The Probationary Directive is reviewable because it is a general enforcement policy.

The Probationary Directive is reviewable under the APA because (1) it announces OSC's general policy of not protecting probationary employees from prohibited personnel practices and (2) none of Defendants' arguments to the contrary compels a different conclusion.[1]

---

[1] Plaintiffs challenge both the Probationary Directive and the Closure Notices. The Directive is reviewable under the APA because it is a general enforcement policy, and the Closure Notices

1. First, the Probationary Directive is a general enforcement policy, not a single-shot non-enforcement decision. The Probationary Directive categorically determines that "probationary terminations" are not "prohibited personnel practices." ECF No. 14-5 at 1. It then directs OSC personnel to follow certain policies and procedures for probationary employee terminations. *Id.* at 5–6. The prescribed procedures require OSC personnel to determine whether the terminated probationary employee argues either that their termination was effectively an illegal RIF or violated certain regulations governing the termination of probationary employees. If so, then the investigation ends with a determination that no prohibited personnel practice occurred. The directive is categorical and prospective. It applies to literally *thousands* of terminated probationary employees. *Id.* at 2. It is not an ad hoc announcement that the agency will decline to enforce civil service laws as to a particular person for a particular offense, but rather a statement of OSC's general enforcement policy as to how its personnel are required to handle probationary terminations that is based entirely OSC interpretation of its statutory authority. Because the Probationary Directive is a general enforcement policy it is reviewable under the APA.

This conclusion is confirmed by a closer look at the reasoning the D.C. Circuit provided in *Crowley*. As discussed above, the *Crowley* court identified three reasons for distinguishing between single-shot non-enforcement decisions and general enforcement policies. The first is that a general enforcement policy is "likely to be [a] direct interpretation[] of the commands of a [particular] statute." *Crowley*, 37 F.3d at 677. This is precisely the case of the Probationary Directive, which concludes that the *en masse* termination of probationary employees did not violate civil services laws. ECF No. 14-5 at 2–3. Specifically, the Directive reaches the legal

---

are reviewable because they were issued pursuant to and are bound up with the enforcement policy set forth in the Directive.

conclusions that such terminations do not constitute a "reduction in force," that RIF regulations are inapplicable, and, that there was consequently no violation of 5 U.S.C. § 2302(b)(12). *Id.* The Probationary Directive declines to enforce certain civil service laws as to probationary employees solely on the basis of the agency's interpretation of its statutory duties.

That sort of statutory-interpretation conclusion is precisely the type of issue that lends itself to judicial review. As the Supreme Court has reemphasized, questions of statutory interpretation are entrusted to the judiciary. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 390 (2024) (explaining that the APA was intended to codify "the traditional understanding that *courts* must decide all relevant questions of law" (cleaned up)); *see also NAACP v. Trump*, 298 F. Supp. 3d 209, 234 (D.D.C.), *aff'd sub nom. DHS v. Regents of the Univ. of California*, 140 S. Ct. 1891 (2020) (explaining that judicial review of any "general enforcement policy" predicated on a view of "what the law requires" is necessary to "preserve the judiciary's role as the ultimate arbiter of statutory meaning").

The second reason *Crowley* gives for distinguishing between single-shot non-enforcement decisions and general enforcement policies is that when an agency announces a "broad policy against enforcement" there is risk that the agency has "consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities." *Crowley*, 37 F.3d at 677 (quoting *Chaney*, 470 U.S. at 833 n.4). The Probationary Directive represents exactly this sort of abdication. The Directive posits that federal agencies may terminate probationary employees *en masse* without violating the CSRA, and it reaches this conclusion based on flawed reasoning that OSC is not obligated to protect probationary employees from prohibited personnel practices. If, as Plaintiffs contend, the Directive is wrong on the law, and, in fact, the mass termination of probationary employees violates the CSRA, then the Directive effectively

exempts an entire class of federal employees from civil service protections and inoculates the entire federal bureaucracy from accountability for violating the civil service rights of those employees. The risk that OSC is engaged in such an abdication of its statutory responsibilities calls out for judicial review. *See Adams v. Richardson*, 480 F.2d 1159, 1163 (D.C. Cir. 1973) (an agency's "consistent failure" to enforce laws it is charged with administering "is a dereliction of duty reviewable in the courts.").

The third, and final, reason that *Crowley* gives for distinguishing single-shot non-enforcement policy decisions and general enforcement policies is that when announcing a general enforcement policy an agency is likely to "present a clearer (and more readily reviewable) statement of its reasons" than "in the context of individual decisions to forego enforcement." *Crowley*, 37 F.3d at 677. The Probationary Directive is exactly the sort of policy statement that the *Crowley* court believed to be amenable to review. The five-page memorandum announces a specific set of changes to agency procedures and articulates the (flawed) legal and policy bases for those changes. ECF No. 14-5. It is a far cry from the type of "cursory, ad hoc, or post hoc" reasoning that epitomize the type of individual non-enforcement decisions that are subject to the presumption of unreviewability. *Crowley,* 37 F.3d at 677. Indeed, "an agency's decision not to bring an enforcement action in an individual case often produces no record of any kind." *MediNatura, Inc. v. Food & Drug Admin.*, 496 F. Supp. 3d 416, 449 (D.D.C. 2020), *aff'd*, 998 F.3d 931 (D.C. Cir. 2021). That is not the case when an agency issues a lengthy statement of its reasoning "include[ing] substantial, detailed legal and policy analysis." *Id.* Such documents— including the Probationary Directive—"create a focus for judicial review" and are "well within a court's competency in applying the APA." *Id.*

In sum, because the Probationary Directive is a general enforcement policy that rests on legal conclusions, it falls outside *Chaney's* ambit. The D.C. Circuit has long held that general enforcement policies are reviewable under the APA. That law is controlling and dictates the outcome here.

2. Defendants' motion to dismiss is as notable for what it omits as for what it includes. The motion offers no discussion of *Crowley* or its progeny, nor does it even acknowledge the principle that general enforcement policies are reviewable under the APA. Instead, the motion resorts to non-sequiturs.

First, Defendants attempt to characterize the closure of OSC's investigation into the complaints submitted by Plaintiffs as "a traditional exercise in enforcement discretion" that requires balancing competing factors including consideration of the agency's policy priorities and resource constraints. Defs.' Mem.   at 20. That argument is foreclosed by the text of the Probationary Directive itself. The Directive posits a single basis for halting all investigations into probationary terminations: the agency argues—in direct contravention of its prior position—that the *en masse* terminations of probationary employees are not prohibited personnel practices. ECF No. 14-5. No other policy or resource-management considerations are mentioned. The Probationary Directive, thus, reflects a change in the agency's legal position, not a policy or resources-based judgment better suited to discretion.

Second, Defendants argue at length that various provisions in the CSRA confer OSC with discretion with regard to whether and how to investigate complaints. *See* Defs.' Mem. at 21–23. This analysis misses the point. The existence of discretion does not grant an agency total immunity from judicial oversight. If it did, the APA's mandate that court's set aside "an abuse of discretion" would be incoherent. 5 U.S.C. § 706(2)(A). The language in section 701(a)(2) limiting review of

any "agency action [] committed to agency discretion" must be read narrowly to give effect to effect to the language in section 706(2)(A) directing courts to review agency actions for "an abuse of discretion." *Chaney*, 470 U.S. at 829 (emphasis omitted). Accordingly, courts have repeatedly recognized that the APA creates a strong presumption of judicial review of agency action and that section 701(a)(2) carves out only "a very narrow exception" to that rule. *Chaney*, 470 U.S. at 830 (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971)).

In any event, under *Chaney*, an action is committed to agency discretion only when a court would have no meaningful standard against which to judge the agency's exercise of discretion" or, in other words, when there is "no law to apply." *Chaney*, 470 U.S. at 830–31 (internal quotation marks omitted). While the CSRA may grant OSC some investigative discretion, it does not follow that there is "no law to apply" here. To the contrary, the Probationary Directive announces an abrupt policy shift at OSC based entirely on the agency's legal interpretation of its statutory and regulatory obligations. In other words, far from there being "no law to apply," this case presents questions of statutory and regulatory interpretation that are amenable to judicial review.

Third, and finally, Defendants argue that they did investigate Plaintiffs' complaints and suggest that the Court should not second guess the adequacy of those investigations. *See* Defs.' Mem. at 23-25. That is an argument about the merits disguised as an argument about reviewability under the APA. The Probationary Directive requires OSC personnel to "investigate" probationary complaints by determining whether they assert certain legal arguments and, if so, summarily close the investigation. Whether or not that protocol is lawful under the APA is the merits question presented in this case. But Defendants chose not to defend OSC's action on the merits in this motion; instead, they seek dismissal under Rule 12(b)(6) exclusively on APA reviewability

grounds (and, as explained below, on Rule 12(b)(1) jurisdictional grounds). Defs.' Mem. at 3. Thus, the Court should not entertain that argument.

Regardless, as Plaintiffs will readily demonstrate once this case reaches the merits, the Probationary Directive's requirement that OSC summarily dismiss probationary complaints is *not* a legally sufficient investigation. Plaintiffs' complaints were not meaningfully investigated. They were summarily dismissed pursuant to broad policy directive predicated on a deeply flawed legal theory. That is not an investigation—and it falls far short of OSC's statutory obligation to investigate complaints from all employees, including probationary employees. 5 U.S.C. § 1212(a)(1)–(2).

## II. Plaintiffs Have Article III Standing.

Plaintiffs have Article III standing because they have adequately alleged injury, causation, and redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561-621 (1992). Defendants do not contest that Plaintiffs have satisfied the injury and causation prongs of the standing test. Defs.' Mem. at 26. That leaves redressability. All that is required to show redressability is that "the relief sought, assuming that the court chooses to grant it, will likely alleviate the particularized injury alleged by the plaintiff." *Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658, 663–64 (D.C. Cir. 1996) (cleaned up). The "D.C. Circuit cautions courts to be 'careful not to require too much from a plaintiff [] to show redressability, lest it abdicate its responsibility of granting relief to those injured by illegal government action.'" *Weingarten v. Devos*, 468 F. Supp. 3d 322, 336 (D.D.C. 2020) (quoting *Cmty. Nutrition Inst. v. Block*, 698 F.2d 1239, 1248 (D.C. Cir. 1983), *rev'd on other grounds*, 467 U.S. 340 (1984)).

The redressability prong is satisfied here. Plaintiffs seek, among other relief, a judgment declaring that OSC's categorical refusal to investigate probationary complaints is unlawful, vacating the Probationary Directive and ordering OSC to reopen and investigate probationary

complaints. Am. Compl. at 37 (Request for Relief). That relief would redress Plaintiffs' injuries. For one, it would ensure Plaintiffs' complaints are fairly investigated in a manner consistent with the law. Moreover, the relief sought would remove a substantial obstacle to Plaintiffs' ultimately obtaining relief, even if it does not guarantee such a victory. Plaintiffs' complaints were summarily closed *because of* the Probationary Directive. *Id*. ¶ 12. And prior to the Probationary Directive, similar complaints submitted by other probationary employees were deemed credible by OSC, resulting in OSC seeking and securing stay orders from MSPB. And since all of that happened, a federal court has independently concluded that the Office of Personnel Management acted unlawfully in directing the probationary terminations and reached that conclusion on the basis of many of the same factual determinations that underlie MSPB's stay orders. *See AFGE v. OPM*, 799 F. Supp. 3d 967 (N.D. Cal. 2025), *appeal docketed* No. 25-5875 (9th Cir. Sept. 18, 2025). So, there is little reason to doubt that should the Court vacate the Probationary Directive and order OSC to investigate Plaintiffs' complaints pursuant to a correct understanding of its statutory obligations, then OSC would be more likely to determine Plaintiffs were unlawfully terminated and to seek recourse on their behalf. No more is required to establish redressability.

Defendants attempt to cast doubt on this straightforward redressability analysis by arguing that that even if Plaintiffs prevail in this litigation there is no guarantee that Plaintiffs' injuries will be redressed because OSC will "still have unreviewable prosecutorial discretion." Defs.' Mem. at 26. This is insufficient to defeat redressability for two reasons. First, an order vacating the Probationary Directive and requiring OSC to conduct a lawful investigation of Plaintiffs' complaints would remove a prohibitive barrier to Plaintiffs ultimately securing legal redress for their unlawful terminations. Second, OSC's refusal to investigate Plaintiffs' complaints is an injury in and of itself, and an order requiring OSC to conduct an investigation would redress that injury.

A. **A favorable decision could remove a prohibitive barrier to Plaintiffs securing redress for their unlawful terminations.**

Plaintiffs have standing because the Probationary Directive has prevented them from securing legal recourse in response to their unlawful terminations. While it may be true that a favorable decision in this lawsuit would not guarantee that OSC would secure relief for Plaintiffs, that uncertainty is not dispositive. Courts have consistently rejected standing theories "that demand complete redressability." *Weingarten*, 468 F. Supp. 3d at 337 (quoting *Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 902 (10th Cir. 2012)). There is also no requirement that a plaintiff "show to a certainty that a favorable decision will redress [its] injur[ies]." *N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290, 305 (D.D.C. 2025) (quoting *Nat'l Wildlife Fed'n v. Hodel*, 839 F.2d 694, 705 (D.C. Cir. 1988)).

To the contrary, in *Massachusetts v. EPA*, 549 U.S. 497 (2007), the Supreme Court held that the redressability prong is satisfied so long as the risk of harm is "reduced to some extent." *Id.* at 526. The Court emphasized that there is standing even if a favorable decision would amount to only "a small incremental step" toward redressing the plaintiff's injuries, explaining: "That a first step might be tentative does not by itself support the notion that federal courts lack jurisdiction to determine whether that step conforms to law." *Id.* at 524. That principle is dispositive here. Vacatur of the Probationary Directive might not guarantee that OSC ultimately secures Plaintiffs any relief. But it's an important first step. And, under *Massachusetts v. EPA*, that is enough.

The cases cited by Defendants do not compel a different conclusion. For one, *America First Legal Foundation v. Greer*, 153 F.4th 1311 (D.C. Cir. 2025) involved statutory provisions that give OSC authority to investigate misconduct related to the Freedom of Information Act (FOIA). There, the plaintiff sued OSC for failure to investigate certain Department of Justice (DOJ) employees for improperly withholding documents requested under FOIA. *Id.* at 1313. But the

plaintiff had separately sued DOJ for the documents, and DOJ was *already* producing the documents pursuant to that separate lawsuit. *Id.* The plaintiff's injuries were not redressable, in part, because OSC only had the authority to sanction or discipline the DOJ employees; it did not have the ability to seek an order compelling DOJ to produce the documents (which were already being produced, in any event). *Id.* at 1316. Here, on the other hand, OSC can seek an order directly staying Plaintiffs' terminations, and no other agency has the authority to provide Plaintiffs that relief.

Likewise, in *Cross v. EEOC*, No. 1:25-cv-3702, 2025 WL 3280764 (D.D.C. Nov. 25, 2025), the plaintiff challenged an Equal Employment Opportunity Commission (EEOC) policy requiring de-prioritization of disparate impact cases. The court found no redressability because even if the policy were vacated the EEOC could still decline to investigate the plaintiff's complaint. *Id.* at *89. But a critical fact for the court was that the challenged policy entirely reflected a "discretionary judgment concerning the allocation of enforcement resources" rather than the "substantive requirements of the law." *Id.* at *3. Here, the Probationary Directive posits a badly misguided legal theory, and Plaintiffs seek not only to have the Directive vacated but also to have OSC's statutory obligations clarified and enforced. Unlike in *Cross*, that relief would meaningfully constrain the agency going forward.

Two D.C. Circuit cases on redressability are much more on point. First, in *Teton Historic Aviation Foundation v. United States Department of Defense*, 785 F.3d 719 (D.C. Cir. 2015), the D.C. Circuit squarely rejected the argument that agency discretion over an ultimate outcome defeats redressability. There, a nonprofit organization devoted to maintaining historic aircraft brought suit to challenge a Department of Defense policy that made it effectively impossible for it to buy surplus aircraft parts from the military. The government contested standing, arguing that

even if the policy were vacated, it "would do no more than make it possible for the Department to sell" surplus parts, and that the Department "would retain complete discretion" over whether and when to liquidate surplus equipment. *Id.* at 725-26. The government emphasized that the plaintiff "lacks the legal right to compel" the Department to sell any property. *Id.* at 726 (citation omitted). The court rejected these arguments. It explained: "Article III does not demand a demonstration that victory in court will without doubt cure the identified injury. The standing requirement would be a high wall indeed if a plaintiff could only sue when the defendant was under an inescapable obligation to act as the plaintiff desired." *Id.* at 727.

*Teton* is on all fours with this case: The plaintiffs sought vacatur of an agency policy that prevented them from obtaining their desired outcome. The agency argued that even absent the policy it maintained absolute discretion to deny plaintiffs their desired outcome. The court held that vacatur would still redress the alleged injuries notwithstanding uncertainty as to how the agency would exercise its discretion going forward. That principle is controlling here.

Second, in *Orangeburg, S.C. v. FERC*, 862 F.3d 1071 (D.C. Cir. 2017), the D.C. Circuit squarely rejected the argument that redressability is defeated if a favorable decision would not remediate every cause of the plaintiff's injury. There, a city in South Carolina wanted to purchase power from a North Carolina power company at favorable rates. The city was unable to do so for two reasons. First, a state regulator in North Carolina would not allow the power company to sell to the city on its desired terms. Second, FERC approved a merger agreement endorsing the pricing restrictions imposed by the state regulator. The city brought suit to invalidate the merger agreement. FERC contested standing on the basis that even if the merger agreement were invalidated the power company would still be required to comply with the restrictions imposed by the state regulator. The court disagreed, explaining that for redressability it is "enough that the

defendant's conduct is one among multiple causes." *Orangeburg*, 862 F.3d at 1080 (quoting 13A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 3531.5, at 31115 (3d ed. 2008)). The court held that redressability prong was satisfied because invalidation of the merger agreement "would diminish the obstacles" preventing the city "form accessing the most reliable and lowest cost power." *Id.* at 1081.

The same logic governs here. Vacatur of the Probationary Directive and order that OSC reopen the investigations into Plaintiffs' complaints may not create certainty that OSC will secure relief on behalf of Plaintiffs, but it "would diminish the obstacles" to Plaintiffs securing relief for their wrongful terminations. Nothing more is required.

**B.    A favorable decision could order OSC to conduct an investigation of Plaintiffs' complaints, which would redress some of their injuries regardless of the outcome of the investigation.**

Plaintiffs have suffered multiple injuries: Plaintiffs have been injured insofar that they have been denied a fair investigation conducted in accordance with the law *and* insofar that that absence of a fair investigation resulted in OSC neither seeking nor securing relief on their behalf. Even if Defendants are correct there is no certainty that a fair investigation would have resulted in Plaintiffs ultimately securing relief before the MSPB, OSC denied them a fair investigation, and that is itself an injury. An order from this Court requiring Defendants to reopen the investigations into Plaintiffs' complaints would obviously redress that injury.

Controlling authority holds the denial of a fair process is an Article III injury, and that such an injury is adequately redressed by an order requiring the agency to follow the correct procedures. The Supreme Court has long recognized that where a plaintiff alleges a procedural injury, it is not necessary to show that remediation of the procedural deficiency would result in a different outcome. *Lujan*, 504 U.S. at 572 n.7; *Massachusetts v. EPA*, 549 U.S. 497, 517–18 (2007). Indeed, a plaintiff "who alleges a deprivation of a procedural protection to which he is entitled never has

to prove that if he had received the procedure the substantive result would have been altered." *Massachusetts*, 549 U.S. at 518 (quoting *Sugar Cane Growers Coop. of Fla. v. Veneman,* 289 F.3d 89, 94–95 (D.C. Cir. 2002)); *see also WildEarth Guardians v. Jewell*, 738 F.3d 298, 306 (D.C. Cir. 2013) (procedural injuries are redressable even if there's no certainty that the ultimate outcome will be different); *Lemon v. Geren*, 514 F.3d 1312, 1314–15 (D.C. Cir. 2008) (same).

Similarly, the D.C. Circuit has repeatedly held that "a plaintiff suffers a constitutionally cognizable injury by the loss of an *opportunity to pursue a benefit* . . . even though the plaintiff may not be able to show that it was *certain to receive* that benefit had it been accorded the lost opportunity." *CC Distribs., Inc. v. United States,* 883 F.2d 146, 150 (D.C. Cir. 1989) (emphasis in original); *Teton*, 785 F.3d at 724–25 (same). That holding is consistent with Supreme Court precedent recognizing that the denial of a fair process is a cognizable injury regardless of whether the correct process would have resulted in a different outcome. *E.g.*, *Bost v. Ill. State Bd. of Elections*, 607 U.S. __, No. 24-568, 2026 WL 96707, at *3 (U.S. Jan. 14, 2026) (election procedures); *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993) (procurement rules); *Carey v. Piphus*, 435 U.S. 247, 266–67 (1978) (1978) (student disciplinary proceedings). Here, an order requiring OSC to reopen the investigations into Plaintiffs' complaints and conduct those investigations consistent with the law would redress an important injury whatever the ultimate outcome of the investigations may be. The redressability prong of the standing test is thus satisfied.

## CONCLUSION

For these reasons, Defendants' Motion to Dismiss for Failure to State a Claim and for Lack of Subject-Matter Jurisdiction should be denied.

Dated: February 2, 2026

Respectfully submitted,

/s/ Ryan Cooper
Ryan Cooper (D.C. Bar No. 1645301)*[+]
Michael C. Martinez (D.C. Bar No. 1686872)
Paul R.Q. Wolfson (D.C. Bar No. 414759)
Elena Goldstein (D.C. Bar No. 90034087)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
Fax: (202) 796-4426
rcooper@democracyforward.org
mmartinez@democracyforward.org
egoldstein@democracyforward.org

*Counsel for Plaintiffs*

* Admission to D.D.C. pending; appearing
  *pro hac vice*

**CERTIFICATE OF SERVICE**

I, hereby, certify that on February 2, 2026, I filed the foregoing Plaintiffs' Opposition to Defendants' Motion to Dismiss for Failure to State a Claim for Lack of Subject-Matter Jurisdiction using the Court's CM/ECF system. Service was effectuated on counsel for all parties through the CM/ECF system.

/s/ Ryan Cooper
Ryan Cooper

*Counsel for Plaintiffs*