**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

|  |  |  |
|---|---|---|
| MORGAN A. SALADINO, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 25-3107 |
| | ) | |
| OFFICE OF SPECIAL COUNSEL, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

---

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS COMPLAINT**

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................. 1

ARGUMENT ........................................................................................................................ 2

    I.    Plaintiffs Do Not Meaningfully Dispute that the Closure Notices Are Unreviewable Nonenforcement Decisions, Which Is Fatal to Their Claims .......... 2

    II.    OSC's Decision Not to Pursue Enforcement for a Set of Substantively Identical Mass Complaints Is Not Reviewable ...................................................................... 6

    III.    Plaintiffs Lack Standing ........................................................................................ 19

CONCLUSION .................................................................................................................... 24

# TABLE OF AUTHORITIES

## Cases

\* *Am. First Legal Found. v. Greer*,
   153 F.4th 1311 (D.C. Cir. 2025) .................................................................. 2, 19, 20, 23

*Am.'s Bldg. Trades Unions v. Dep't of Def.*,
   783 F. Supp. 3d 290 (D.D.C. 2025) ........................................................ 19

*Apprio, Inc. v. Zaccari*,
   No. 1:18-cv-2180-JDB, 2021 WL 2209404 (D.D.C. June 1, 2021),
   *aff'd* 104 F.4th 897 (D.C. Cir. 2024) ..................................................... 4

*CD Int'l Enters., Inc. v. Rockwell Cap. Partners*, *Inc.*,
   251 F. Supp. 3d 39 (D.D.C. 2017) .......................................................... 4

*Clark v. OPM*,
   95 F.3d 1139 (Fed. Cir. 1996) ................................................................ 16

\* *Cross v. EEOC*,
   --- F. Supp. 3d ---, 2025 WL 3280764 (D.D.C. Nov. 25, 2025) .............. 2, 19, 20, 23

\* *Crowley Caribbean Transp., Inc. v. Peña*,
   37 F.3d 671 (D.C. Cir. 1994) ................................................................ *passim*

*CTS Corp. v. EPA*,
   759 F.3d 52 (D.C. Cir. 2014) ................................................................ 4

*Gold Rsrv., Inc. v. Bolivarian Republic of Venezuela*,
   146 F. Supp. 3d 112 (D.D.C. 2015) ....................................................... 4

\* *Heckler v. Chaney*,
   470 U.S. 821 (1985) ............................................................................... *passim*

\* *ICC v. Bhd. of Locomotive Eng'rs*,
   482 U.S. 270 (1987) ............................................................................... 4, 5, 18

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ............................................................................... 19-20, 23

*Massachusetts v. EPA*,
   549 U.S. 497 (2007) ............................................................................... 2, 20, 21

*O.A. v. Trump,*
   404 F. Supp. 3d 109 (D.D.C. 2019) ........................................................................... 4

*Orangeburg v. FERC,*
   862 F.3d 1071 (D.C. Cir. 2017) ................................................................... 2, 21, 22

*OSG Bulk Ships, Inc. v. United States,*
   132 F.3d 808 (D.C. Cir. 1998) ....................................................................... 2, 6, 11

*OSG Bulk Ships, Inc. v. United States,*
   921 F. Supp. 812 (D.D.C. 1996) ............................................................................. 11

*Sierra Club v. Jackson,*
   648 F.3d 848 (D.C. Cir. 2011) ............................................................................. 8, 9

*Teton Historic Aviation Foundation v. United States Department of Defense,*
   785 F.3d 719 (D.C. Cir. 2015) ............................................................................... 21

*TransUnion LLC v. Ramirez,*
   594 U.S. 413 (2021) ................................................................................................ 10

* *United States v. Texas,*
   599 U.S. 670 (2023) ..................................................................................... 9, 10, 12

*Uranga v. U.S. Citizenship & Immigr. Servs.,*
   490 F. Supp. 3d 86 (D.D.C. 2020) ....................................................................... 3-4

*WildEarth Guardians v. Jewell,*
   738 F.3d 298 (D.C. Cir. 2013) ............................................................................... 23

**Constitutional Provisions**

U.S. Const., art. II, § 3 ................................................................................................ 10

**Statutes**

* 5 U.S.C. § 701 ............................................................................................................. 3

5 U.S.C. § 706 ............................................................................................................ 17

* 5 U.S.C. § 1214 ....................................................................................... 7, 13, 15, 20

5 U.S.C. § 2302 .......................................................................................................... 14

**Other Authorities**

U.S. Office of Special Counsel, Annual Report to Congress for Fiscal Year 2024,
https://osc.gov/Documents/Resources/Congressional%20Matters/Annual%20Reports
%20to%20Congress/FY%202024%20Annual%20Report%20to%20Congress.pdf ............... 17

# INTRODUCTION

As Defendants showed in their opening memorandum,[1] Plaintiffs' challenges to the Office of Special Counsel's (OSC) Closure Notices declining to pursue enforcement of their complaints[2] with the Merit Systems Protection Board (MSPB) fail at the threshold.  Likewise as to the OSC's internal April 8 memorandum to staff guiding them to close other complaints that present the same legal issues and no distinguishing factual allegations.  The Closure Notices and April 8 memorandum represent unreviewable exercises of enforcement discretion, and a Court order to reopen Plaintiffs' complaints would not redress their alleged injuries.  Plaintiffs fail to mount a persuasive response in their Opposition.[3]

*First*, Plaintiffs focus their merits argument entirely on the April 8 memorandum and fail to preserve their challenge to the Closure Notices.  That dooms Plaintiffs' claims because arguments in a motion to dismiss that are not meaningfully addressed in an opposition brief are generally deemed conceded and forfeited.  And Plaintiffs' failure to preserve their challenge to the Closure Notices fatally undermines their standing theory, which depends on the Court vacating the Closure Notices and ordering reinvestigation of their OSC complaints.

*Second*, Plaintiffs are incorrect that the April 8 memorandum is reviewable as a general enforcement policy.  To the contrary, it is a focused decision not to pursue enforcement for a discrete set of substantively identical mass complaints, based on OSC's "mingled assessments of fact, policy, and law."  *Crowley Caribbean Transp., Inc. v. Peña*, 37 F.3d 671, 677 (D.C. Cir. 1994).  It bears none of the hallmarks of the type of policies that the D.C. Circuit has indicated

---

[1] Defs.' Mem. in Supp. of Mot. to Dismiss Compl., ECF No. 21-1 ("Memorandum" or "Mem.").
[2] Defendants use lowercase "complaints" to refer to administrative complaints with OSC, and capitalized "Complaint" to refer to Plaintiffs' Complaint in this lawsuit.
[3] Pls.' Opp'n to Defs.' Mot. to Dismiss the Compl. for Failure to State a Claim and Lack of Subject-Matter Jurisdiction, ECF No. 23 ("Opposition" or "Opp'n").

could be reviewable, such as a "formal regulation after the full rulemaking process," *id.* at 676, a "universal policy statement," *id.*, or a "longstanding interpretation" of an agency's governing statute that the agency "has consistently" followed for decades, *OSG Bulk Ships, Inc. v. United States*, 132 F.3d 808, 809, 815 (D.C. Cir. 1998).

*Third*, Plaintiffs fail to satisfy the redressability element of standing.  Even if the Court ordered all the relief sought by Plaintiffs, including ordering OSC to reopen and reinvestigate their complaints, it would remain speculative whether such reinvestigation would provide redress for Plaintiffs' underlying injuries of losing their federal employment.  Plaintiffs misstate the law in arguing that mere diminution of obstacles to relief is sufficient.  Even the cases cited by Plaintiffs recognize that redress must be "likely."  *E.g.*, *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007); *Orangeburg v. FERC*, 862 F.3d 1071, 1077, 1084 (D.C. Cir. 2017).  Furthermore, Plaintiffs cannot establish redressability by arguing that the Court can vindicate a purported "procedural" right to a "fair investigation," Opp'n 31, because the Court "may not compel" the exercise of OSC's "enforcement discretion," *Am. First Legal Found. v. Greer*, 153 F.4th 1311, 1315 (D.C. Cir. 2025), and "could not require a certain depth, length, or outcome from the investigation," *Cross v. EEOC*, --- F. Supp. 3d ---, 2025 WL 3280764, at *8 (D.D.C. Nov. 25, 2025).

## ARGUMENT

### I.    Plaintiffs Do Not Meaningfully Dispute that the Closure Notices Are Unreviewable Nonenforcement Decisions, Which Is Fatal to Their Claims

Defendants' opening Memorandum explained that the Closure Notices informing Plaintiffs Cheryl Healy and Morgan Saladino of the closures of their complaints, MTD Exs. 7, 8, ECF Nos. 21-9, 21-10, and the April 8 memorandum announcing that OSC would not pursue enforcement in other complaints based on the same legal theories and materially indistinguishable facts, Compl. Ex. E, ECF No. 14-5, were agency "[r]efusals to take enforcement steps," *Heckler v. Chaney*, 470

U.S. 821, 831 (1985), that are unreviewable under 5 U.S.C. § 701(a)(2) and *Heckler*.  *See* Mem. 18-25.

    In response, Plaintiffs attempt (unsuccessfully, *see infra*, Part II) to rebut Defendants' argument as to the April 8 memorandum, which Plaintiffs call the "Probationary Directive," but Plaintiffs make no attempt to rebut Defendants' argument that the Closure Notices are unreviewable.   Part I of Plaintiffs' Opposition is headed, "The Probationary Directive Is Reviewable Under the Administrative Procedure Act."  Opp'n 17.  In that part, Plaintiffs argue that because the April 8 memorandum addresses a large set of complaints rather than a single complaint, it should be considered a reviewable "general enforcement policy," notwithstanding *Heckler* and its progeny.  *See id.* at 17-26.  That argument plainly does not apply to the Closure Notices, which were individual notices sent to Plaintiff Healy and Plaintiff Saladino, informing Plaintiffs that OSC was closing their respective individual complaints.  *See* MTD Ex. 7 (Healy Closure Notice); MTD Ex. 8 (Saladino Closure Notice).  In their argument, Plaintiffs mention the Closure Notices only in a short footnote that cites no authority: "Plaintiffs challenge both the Probationary Directive and the Closure Notices.  The Directive is reviewable under the APA because it is a general enforcement policy, and the Closure Notices are reviewable because they were issued pursuant to and are bound up with the enforcement policy set forth in the Directive." Opp'n 20-21 n.1.

    Plaintiffs do not meaningfully dispute Defendants' argument that the Closure Notices are unreviewable, and the Court should accordingly treat the issue as conceded.   "[I]t is well understood in this Circuit that when a plaintiff files an opposition to a motion to dismiss addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."  *Uranga v. U.S. Citizenship & Immigr. Servs.*, 490 F. Supp. 3d 86,

109 (D.D.C. 2020) (quoting *CD Int'l Enters., Inc. v. Rockwell Cap. Partners*, *Inc.*, 251 F. Supp. 3d 39, 46 (D.D.C. 2017)).  A cursory footnote without citation to authority, such as footnote 1 of the Opposition, is insufficient to preserve an issue.  "'[P]erfunctory and undeveloped arguments' are 'deemed waived,' and '[t]his is especially true where the only reference to the argument is raised in a footnote.'"  *Apprio, Inc. v. Zaccari*, No. 1:18-cv-2180-JDB, 2021 WL 2209404, at *10 n.8 (D.D.C. June 1, 2021), (quoting *Gold Rsrv., Inc. v. Bolivarian Republic of Venezuela*, 146 F. Supp. 3d 112, 126 (D.D.C. 2015), *aff'd* 104 F.4th 897 (D.C. Cir. 2024); *see also O.A. v. Trump*, 404 F. Supp. 3d 109, 132 n.8 (D.D.C. 2019) ("A footnote is no place to make a substantive legal argument . . . hiding an argument there and then articulating it in only a conclusory fashion results in forfeiture.") (quoting *CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014)).

Even if the Court did not treat the unreviewability of the Closure Notices as conceded, Plaintiffs' unsupported argument that an individual nonenforcement decision is reviewable because it is "bound up with" a purportedly reviewable legal determination, Opp'n 20-21 n.1, contravenes Supreme Court precedent.  The Supreme Court has rejected the argument that "if the agency gives a 'reviewable' reason for otherwise unreviewable action, the action becomes reviewable."  *ICC v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270, 283 (1987).  For example, "a common reason for failure to prosecute an alleged criminal violation is the prosecutor's belief (sometimes publicly stated) that the law will not sustain a conviction.  That is surely an eminently 'reviewable' proposition, in the sense that courts are well qualified to consider the point; yet it is entirely clear that the refusal to prosecute cannot be the subject of judicial review."  *Id.*  The Closure Notices constitute refusals to prosecute (in the administrative sense) Plaintiffs' claims before the MSPB.  For example, Plaintiff Healy's Closure Notice explained that OSC "planned to take no further action on your complaint," and that "we have closed our file in this matter."  MTD

Ex. 7 (Healy Closure Notice); *accord* MTD Ex. 8 (Saladino Closure Notice). That Closure Notice followed a preliminary determination that "OSC plans to take no further action on your complaint," meaning Plaintiff Healy's individual complaint, with an opportunity for her to provide additional evidence or argument to persuade OSC to reconsider. MTD Ex. 5, ECF No. 21-7 (Healy preliminary determination); *accord* MTD Ex. 6, ECF No. 21-8 (Saladino preliminary determination). The contention that some of the reasons for these closures of Plaintiffs' individual complaints were based in a memorandum containing legal errors does not change the fact that the closures of Plaintiffs' complaints are not reviewable. *See Crowley*, 37 F.3d at 676 (recognizing that the Supreme Court has "squarely reject[ed] the notion of carving reviewable legal rulings out from the middle of non-reviewable actions") (citing *Bhd. of Locomotive Eng'rs*, 482 U.S. 270 (1987))

Plaintiffs' failure to preserve the argument that the Closure Notices are reviewable also fatally undermines their rebuttal to Defendants' argument that they lack Article III standing. In short, Plaintiffs' standing argument is that if the Court vacated the April 8 Memorandum and Closure Notices and ordered OSC to reopen and reinvestigate Plaintiffs' complaints under specified legal principles, that would provide enough of a possibility of redress to satisfy the redressability element. *See generally* Opp'n 27-32. That argument is incorrect, as shown below. *See infra*, Part III. But it is plain that vacating only the April 8 Memorandum, without vacating the Closure Notices, could not redress Plaintiffs' alleged injuries, since their complaints with OSC would remain closed. Thus, Plaintiffs' failure to contest the unreviewability of the Closure Notices forecloses their theory of redressability.

To dismiss this case, this Court need go no further than to hold that Plaintiffs have not adequately disputed, and thus have conceded, that the Closure Notices are unreviewable. And

because success on Plaintiffs' only remaining challenge, to the April 8 Memorandum, could not redress Plaintiffs' alleged injuries, Plaintiffs lack standing to pursue that challenge.

## II.    OSC's Decision Not to Pursue Enforcement for a Set of Substantively Identical Mass Complaints Is Not Reviewable

1.    As Defendants showed in their opening memorandum, "agency '[r]efusals to take enforcement steps'" are subject to a "presumption . . . that judicial review is not available," given the many "reasons for the 'general unsuitability for judicial review of agency decisions to refuse enforcement.'"  Mem. 18-19 (quoting *Heckler*, 470 U.S. at 831).  Plaintiffs do not dispute that "enforcement discretion is *presumptively* unreviewable," but they argue that the April 8 memorandum is reviewable as a "general enforcement polic[y]."  Opp'n 17.  Plaintiffs rely primarily on *Crowley*, 37 F.3d 671, which stated in dicta that certain general enforcement policies would be reviewable, *id.* at 676, and *OSG Bulk Ships*, 132 F.3d at 812, which held that an agency's longstanding legal interpretation of its governing statute was reviewable.  Plaintiffs' argument hinges on characterizing the April 8 memorandum as "a general enforcement policy rather than an *ad hoc* exercise of discretion."  Opp'n 20.

Plaintiffs misunderstand the April 8 memorandum.  Far from announcing "universal" enforcement principles, *Id.* at 18 (quoting *Crowley*, 37 F.3d at 676) the April 8 memorandum is a focused decision not to pursue enforcement for a discrete set of substantively identical mass complaints based on OSC's assessment of the facts, preliminary analysis of the law, and policies regarding enforcement discretion.  Since the Supreme Court's decision in *Heckler*, which similarly involved an agency decision to decline enforcement in a set of similar cases, it has been clear that a discrete decision not to enforce in a set of like matters is not reviewable.

The April 8 memorandum makes plain that its application is limited to a set of substantively identical mass complaints submitted around the same time.  The memorandum starts by defining

its scope as a set of complaints by probationary employees "alleging that their probationary terminations constituted a prohibited personnel practice (PPP) since no earlier than January 20, 2025 through the present."  Compl. Ex. E, at 1.  The memorandum notes that OSC has reviewed 2,094 such complaints submitted since February 2025, and OSC's "review of these probationary termination complaints" revealed "that nearly all of them presented the same legal issues." *Id.*[4] The memorandum then discussed how certain statutes, case law, and regulations may apply to the "facts alleged" in these mass complaints.  *Id.* at 2.  This discussion led OSC to make a discretionary determination not to pursue enforcement of these complaints, explaining that the lack of "well-established precedent" supporting one of the complainants' theories counseled against OSC "assert[ing] itself into this unsettled legal question."  *Id.*; *see also id.* at 4 (regulations that limit the procedural rights of probationary employees "weigh[] heavily against treating alleged violations outside of those limitations as matters in which OSC should intervene").  Yet the memorandum was explicit that it applied only to "cases involving probationary employee terminations from January 20, 2025 through May 31, 2025" that were legally and factually indistinguishable from the mass complaints that OSC had reviewed.  *Id.* at 4.  That is, based on the agency's discretionary authority to investigate a case "to the extent necessary," *id.*  at 4 (citing 5 U.S.C. § 1214(a)(1)(A)), OSC should decline to investigate "further" only if OSC's initial investigation reveals that "the probationary employee's complaint 'present[s] the same legal issues'" as the mass complaints

---

[4] Plaintiffs' complaints with OSC illustrate the undifferentiated nature of the probationary termination complaints that OSC received in early 2025.  Plaintiffs' counsel submitted a series of mass complaints with general arguments that applied to all terminated probationary employees, *see* MTD Ex. 1, ECF No. 21-3 (Amended Complaint on Behalf of Terminated Probationary Employees); MTD Ex. 3, ECF No. 21-5 (Amended Complaint on Behalf of Terminated Probationary Employees), naming the covered complainants in appended lists or spreadsheets, *see* MTD Ex. 2, ECF No. 21-4; MTD Ex. 4, ECF No. 21-6.

reviewed by OSC "*and no other substantial allegation or evidence of a recognized PPP or whistleblower disclosure*." *Id.*

    **2.** Supreme Court and D.C. Circuit precedent make clear that an agency's refusal not to enforce in a set of similar cases is unreviewable. Start with *Heckler* itself. In *Heckler*, FDA considered whether to pursue enforcement related to alleged misbranding as applied to multiple drugs used for lethal injections in many states. *See Heckler*, 470 U.S. at 824. FDA concluded that it would "decline to exercise" jurisdiction "in the area," meaning the entire field of drugs being used for lethal injunctions in human executions, "under our inherent discretion to decline to pursue certain enforcement matters." *Id.* The decision was not localized to a specific lethal injection drug in a specific state. Rather, as the Supreme Court framed it, FDA categorically "conclud[ed] that FDA jurisdiction in the area . . . should not be exercised to interfere with this particular aspect of state criminal justice systems." *Id.* The fact that FDA's nonenforcement decision extended to all similar cases in the same subject matter area did not stop the Supreme Court from "conclud[ing] that the presumption that agency decisions not to institute proceedings are unreviewable" fully applied. *Id.* at 837. Here, Plaintiffs note that the April 8 memorandum "applies to literally *thousands* of terminated probationary employees," Opp'n 21, but that is because OSC received a set of thousands of substantively identical mass complaints at around the same time, *see* Compl. Ex. E at 1. Under *Heckler*, an agency's decision not to pursue enforcement in a set of like cases is the paradigm of unreviewable enforcement discretion.

    Similarly, in *Sierra Club v. Jackson*, 648 F.3d 848 (D.C. Cir. 2011), the D.C. Circuit held that an agency's "failure to take action to prevent the construction of three proposed pollution-emitting facilities in Kentucky." *Id.* at 850. Even though multiple cases were at issue, the D.C. Circuit did not mention *Crowley* or *OSG Bulk Ships*. Rather, the court discussed *Heckler* at length

before concluding that "the APA does not provide a cause of action to review the Administrator's failure to act . . . because her decision is an agency action 'committed to agency discretion by law.'"  *Id.* at 856-57.  Thus, *Sierra Club* reaffirms that an agency's "failure to act" in multiple related cases is not reviewable.

The reasons articulated in *Heckler* for the "the general unsuitability for judicial review of agency decisions to refuse enforcement," 470 U.S. at 831, apply fully to agency decisions not to enforce in a series of similar cases.  "First, an agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise," such as "whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and, indeed, whether the agency has enough resources to undertake the action at all."  *Id.*  Decisions about whether to enforce in a large number of similar cases implicate the allocation of "agency resources" and "the agency's overall policies" even more than a decision whether to enforce in a single matter.  For example, the April 8 memorandum addressed resource constraints by explaining that agency staff could conduct "limited" review of a series of more 2,000 complaints, Compl. Ex. E at 1, 4, and addressed agency policies about the types of "matters in which OSC should intervene," *id.* at 4.

Second, "when an agency refuses to act it generally does not exercise its *coercive* power over an individual's liberty or property rights, and thus does not infringe upon areas that courts often are called upon to protect."  *Heckler*, 470 U.S. at 832.  That is equally true of a decision not to enforce in a series of related cases.  Plaintiffs do not and cannot contend that the April 8 memorandum exercised coercive power over them or anyone else.  Notably, in *United States v. Texas*, 599 U.S. 670 (2023), a case in which the Supreme Court rejected on Article III standing

grounds a challenge to the Department of Homeland Security's guidelines for immigration enforcement, which had far broader application than the April 8 memorandum, *see id.* at 673-74, the Supreme Court explained that "when the Executive Branch elects *not* to arrest or prosecute, it does not exercise coercive power over an individual's liberty or property, and thus does not infringe upon interests that courts often are called upon to protect," *id.* at 678.

"Finally, . . . an agency's refusal to institute proceedings shares to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict—a decision which has long been regarded as the special province of the Executive Branch, inasmuch as it is the Executive who is charged by the Constitution to 'take Care that the Laws be faithfully executed.'" *Heckler*, 470 U.S. at 832 (quoting U.S. Const., art. II, § 3). This concern applies equally, if not more so, to enforcement decisions that affect many cases. For example, in *United States v. Texas*, which involved an agency's broad enforcement priorities, the Supreme Court explained that "lawsuits alleging that the Executive Branch has made an insufficient number of arrests or brought an insufficient number of prosecutions run up against the Executive's Article II authority to enforce federal law," because under the Take Care Clause, "the Executive Branch possesses authority to decide 'how to prioritize and how aggressively to pursue legal actions against defendants who violate the law.'" 599 U.S. at 678 (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021)).

3.      In light of the ample precedent holding that agency enforcement decisions that affect multiple cases are unreviewable, *Crowley* and *OSG Bulk Ships* cannot bear the weight Plaintiffs place on them. Those cases are distinguishable and address situations that bear no resemblance to the April 8 memorandum, which declines to pursue enforcement for a discrete set of substantively identical complaints. In *Crowley*, the D.C. Circuit opined in dicta that "an

agency's statement of a *general enforcement policy* may be reviewable for legal sufficiency where the agency has expressed the policy as a formal regulation after the full rulemaking process . . . or has otherwise articulated it in some form of universal policy statement . . . ." 37 F.3d at 676. The April 8 memorandum was an *internal* memorandum circulated to agency staff, not a formal regulation. And its limited scope, applying to a set of mass complaints so long as they present solely "the same legal issues . . . *and no other substantial allegation or evidence*," Compl. Ex. E at 4, hardly makes it a universal policy statement.

*OSG Bulk Ships* is also distinguishable. There, the D.C. Circuit held that it could review the Maritime Administration's (MarAd) legal interpretation of its governing statute that when shipowners received construction subsidies in exchange for a promise to operate exclusively in the foreign trade, the ship could freely operate in the domestic trade after the conclusion of the vessel's statutory economic life. *OSG Bulk Ships*, 132 F.3d at 810-11. MarAd had adopted that legal interpretation in a 1964 agency memorandum, which had been endorsed by a 1964 Comptroller General opinion, *see OSG Bulk Ships, Inc. v. United States*, 921 F. Supp. 812, 822 (D.D.C. 1996), and MarAd had adhered to this "long-standing and consistent interpretation of the Merchant Marine Act," *id.* at 818, when making enforcement decisions over the intervening decades. The D.C. Circuit characterized this "longstanding interpretation," *OSG Bulk Ships*, 132 F.3d at 809, to which MarAd "ha[d] consistently" adhered, *id.* at 815, as "a general enforcement policy" that "is subject to review," *id.* at 812. But an agency's decades-long, consistently applied legal interpretation of its governing statute is a far cry from a decision not to pursue enforcement in a discrete set of substantively identical complaints.

The Supreme Court's recent decision in *United States v. Texas* confirms that the set of general enforcement policies that are reviewable under the APA is narrow. The Supreme Court

explained that "[u]nder the Administrative Procedure Act, a plaintiff arguably could obtain review of agency non-enforcement if an agency 'has consciously and expressly adopted a *general policy that is so extreme as to amount to an abdication of its statutory responsibilities*,'" such as where "the Executive *has entirely ceased enforcing* the relevant statutes." 599 U.S. at 682-83 (emphasis added) (quoting *Heckler*, 470 U.S. at 833 n.4). Yet as explained below, Plaintiffs cannot plausibly contend that the April 8 memorandum's decision not to enforce for a discrete set of substantively identical complaints equates to entirely ceasing enforcement of the CSRA, or is so extreme as to amount to abdication. *See infra*, pp. 14-15.

**4.** Plaintiffs' arguments for treating the April 8 memorandum as a reviewable general enforcement policy do not withstand scrutiny. Plaintiffs rely principally on a set of characteristics of general enforcement policies identified in *Crowley*. As explained above, given subsequent case law recognizing the unreviewability of agency enforcement decisions that affect multiple cases, *Crowley* and *OSG Bulk Ships* should be read narrowly. But in any event, none of those characteristics identified in *Crowley* applies to the April 8 memorandum.

**a.** Plaintiffs first argue that "a general enforcement policy is 'likely to be [a] direct interpretation[] of the commands of a [particular] statute,'" Opp'n 21 (quoting *Crowley*, 37 F.3d at 677), which "is precisely the case of the Probationary Directive," *id.* Yet the full passage from *Crowley*, from which Plaintiffs selectively quote a snippet, cuts against their argument:

> By definition, expressions of broad enforcement policies are abstracted from the particular combinations of facts the agency would encounter in individual enforcement proceedings. As general statements, they are more likely to be direct interpretations of the commands of the substantive statute rather than the sort of mingled assessments of fact, policy, and law that drive an individual enforcement decision and that are, as *Chaney* recognizes, peculiarly within the agency's expertise and discretion.

*Crowley*, 37 F.3d at 677.

The April 8 memorandum is not "abstracted from the particular combinations of facts the agency would encounter in individual enforcement proceedings." *Id.* Rather, it grounds itself in and limits itself to the facts presented by the set of probationary termination complaints filed in early 2025. It begins by discussing the "complaints from employees at numerous agencies alleging that their probationary terminations constituted a prohibited personnel practice (PPP) since no earlier than January 20, 2025 through the present," and explains that OSC's "review" of these complaints revealed "that nearly all of them presented the same legal issues." Compl. Ex. E at 1. It then describes how relevant legal principles bear on "the facts alleged" in those complaints, *id.* at 2, and expressly limits itself to "cases involving probationary employee terminations from January 20, 2025 through May 31, 2025," that "present[] the same legal issues . . . *and no other substantial allegation or evidence*" from the substantively identical mass complaints reviewed by OSC, *id.* at 4.

Rather than an abstract announcement of legal principles, the April 8 memorandum presents a "mingled assessment[] of fact, policy, and law" to drive OSC's enforcement discretion. *Crowley*, 37 F.3d at 677. After discussing the factual background of these complaints, OSC describes some relevant case law and regulations. *See* Compl. Ex. E at 2 (discussing case law involving RIFs); *id.* at 2-4 (discussing case law and regulations regarding the rights of probationary employees). That legal and factual discussion, combined with OSC's discretionary authority on how to conduct investigations, leads to a policy assessment of how best to exercise OSC's enforcement discretion. For example, OSC concluded that based on its authority under 5 U.S.C. § 1214(a)(1)(A), the "investigation necessary to determine whether there are reasonable grounds to believe that a PPP has occurred, exists, or is to be taken, is limited." Compl. Ex. E at 3. Although informed by OSC's legal analysis, that is an inherently policy-based judgment about

OSC's authority on conducting an investigation "to the extent necessary" and ultimately to not pursue further enforcement proceedings.

Plaintiffs thus mischaracterize the memorandum as "a direct interpretation of the commands of a particular statute," Opp'n 21 (quoting *Crowley*, 37 F.3d at 677) (alterations omitted), meaning a pure legal interpretation. Plaintiffs assert that the memorandum "reaches the legal conclusions that such terminations do not constitute a 'reduction in force,' that RIF regulations are inapplicable, and, that there was consequently no violation of 5 U.S.C. § 2302(b)(12)." *Id.* at 21-22. In fact, OSC expressed doubt about the validity of complainants' claims of a de facto RIF, but did not come to a definitive legal conclusion. After quoting case law regarding RIFs, the memorandum explained that "[i]t is not apparent from the facts alleged" that the terminations meet the standard for a RIF identified in the case law, "there is no well-established precedent" supporting the complainants' position, and "OSC will not assert itself into this unsettled legal question," which could be resolved in "ongoing litigation." Compl. Ex. E at 2. OSC's policy decision not to pursue enforcement actions resting on an unsettled legal theory based on concerns about the legal and factual support for the claims is precisely "the sort of mingled assessment[] of fact, policy, and law" that is "peculiarly within the agency's expertise and discretion." *Crowley*, 37 F.3d at 677.

**b.**    Plaintiffs next cite *Crowley* to argue that "when an agency announces a 'broad policy against enforcement' there is risk that the agency has 'consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities.'" Opp'n 22 (quoting *Crowley*, 37 F.3d at 677). But the April 8 memorandum is not a broad policy against enforcement, let alone one so extreme as to amount to abdication. The memorandum addresses only a discrete set of complaints, those filed by probationary employees removed from

14

January 20, 2025, through May 31, 2025, that present "no other substantial allegation or evidence" beyond those presented in a set of substantively identical mass complaints.  Compl. Ex. E at 4. The memorandum explains that for that discrete set of covered complaints, although the investigation called for by the memorandum is "limited," it complies with the statutory requirement to investigate PPP complaints "to the extent necessary" to determine how to proceed. *Id.* (quoting 5 U.S.C. § 1214(a)(1)(A)).

Plaintiffs overread the memo as "posit[ing] that federal agencies may terminate probationary employees *en masse* without violating the CSRA."  Opp'n 22.  To the contrary, the memorandum is limited to the specific allegations asserted in the complaints it received and provides that staff "should not assume that there are no exceptions based on individual circumstances," and that the analysis could differ if there is "substantial evidence of a RIF" or "the termination was motivated a recognized PPP, such as whistleblower retaliation."  Compl. Ex. E at 1, 2, 4.  In short, the memorandum simply expressed doubt on the viability of a specific set of allegations asserted in substantively identical mass complaints, and guided staff to exercise discretion to conduct streamlined investigations (unless individual circumstances dictate otherwise) in reviewing that set of complaints.  That is a specific exercise of enforcement discretion, not an extreme and general abdication of statutory responsibilities.

**c.** Plaintiffs next argue that the April 8 memorandum is a general enforcement policy because "when announcing a general enforcement policy an agency is likely to 'present a clearer (and more readily[5] reviewable) statement of its reasons' than 'in the context of individual decisions to forego enforcement,'" Opp'n 23 (quoting *Crowley*, 37 F.3d at 677), "whereas individual enforcement decisions 'tend to be cursory, ad hoc, or post hoc,'" *id.* at 19 (quoting *Crowley*, 37

---

[5] The quoted passage of *Crowley* reads "easily" here, not "readily."  *Crowley*, 37 F.3d at 677.

F.3d at 677). It is ironic that Plaintiffs tout the memorandum as "clear[]" rather than "cursory" in its "statement of its reasons," Opp'n 19, 23, while simultaneously deeming it "poorly reasoned" and lacking a sufficient "evidentiary record." Compl. ¶¶ 8, 99, ECF No. 14. The memorandum's legal analysis is fairly brief at less than three pages, but such a concise legal analysis was sufficient and appropriate because the memorandum was merely an internal direction to staff conveying OSC's operational guidance on how to proceed in a discrete set of cases, rather than an authoritative legal articulation of the law regarding probationary employees. For example, when discussing whether the terminations at issue were RIFs, after citing a single case, OSC simply declined as a policy matter to "assert itself into this unsettled legal question," which was being tested in "ongoing litigation." Compl. Ex. E at 2.[6]

5.     Plaintiffs attempt to counter other points Defendants made to show that the April 8 memorandum is an unreviewable exercise of enforcement discretion, but their rejoinders are unpersuasive. Plaintiffs dispute Defendants' characterization of the memorandum as "a traditional exercise in enforcement discretion" by arguing that it "posits a single basis for halting all investigations into probationary terminations: . . . that the *en masse* terminations of probationary employees are not prohibited personnel practices." Opp'n 24 (citing Mem. 20). This oversimplifies the memorandum and ignores its text, which cites doubt about the viability of the

---

[6] Notably, OSC provided much more detailed legal analysis in a public document that it submitted in a proceeding before the MSPB, where if the MSPB issued an order adopting OSC's positions, that MSPB order would be subject to judicial review. Specifically, OSC submitted a 34-page amicus brief to the MSPB opining on various legal issues governing probationary employees as relevant to a pending request for review of implementation of OPM regulations regarding probationary employees. MTD Ex. 9, ECF No. 21-11. If the MSPB resolves that request in a way that addresses the merits of the OPM regulations under review, then the MSPB's decision will be reviewable in the Federal Circuit. *Clark v. OPM*, 95 F.3d 1139, 1142 (Fed. Cir. 1996).

claims as policy reasons to exercise discretion not to pursue them.[7]  Plaintiffs also contend that the memo does not mention "resource-management considerations." *Id.* at 24.  To the contrary, the memorandum explains that "OSC has received 2,094 complaints," Compl. Ex. E. at 1, and concludes that a "limited" review of these "similar" complaints can comply with "the statutory requirement for investigation of PPP complaints," *id.* at 4.  It is self-evident that pursuing enforcement of more than 2,000 complaints would strain the resources of an agency with a relatively small staff.  *See* U.S. Office of Special Counsel, Annual Report to Congress for Fiscal Year 2024, at 12, *available at* https://osc.gov/Documents/Resources/Congressional%20Matters/Annual%20Reports%20to%20Congress/FY%202024%20Annual%20Report%20to%20Congress.pdf, (last visited Feb. 9, 2026) (noting that in Fiscal Year 2024, OSC "operated with a staff of approximately 129 full-time equivalent (FTE) employees" (footnote omitted)).

Plaintiffs do not dispute Defendants' point "that various provisions in the CSRA confer OSC with discretion with regard to whether and how to investigate complaints," but they argue that "[t]his analysis misses the point" because the APA authorizes review of agency actions for "an abuse of discretion."  Opp'n 24 (quoting 5 U.S.C. § 706(2)(A)); *see* Mem. 21-23.  It is Plaintiffs who miss the point.  *Heckler* recognizes that even though agency actions are generally reviewable for abuse of discretion under the APA, "[r]efusals to take enforcement steps" are presumptively unreviewable.  470 U.S. at 831.

---

[7] *See* Compl. Ex. E at 2 (after noting that "[i]t is not apparent from the facts alleged" that the terminations meet the legal standard for a RIF and that "no well-established precedent" supports Plaintiffs' theory, concluding that "OSC will not assert itself into this unsettled legal question"); *id.* at 4 (regulations limiting rights of probationary employees "weigh[] heavily against" treating these cases "as matters in which OSC should intervene").

Plaintiffs next argue that nonenforcement decisions are subject to review if they contain an allegedly erroneous legal interpretation because then a court can rule on the validity of the agency's legal interpretation, which provides "law to apply."  Opp'n 25 (quoting *Heckler*, 470 U.S. at 830-31).  However, in *Brotherhood of Locomotive Engineers*, the Supreme Court rejected the notion that "if the agency gives a 'reviewable' reason for otherwise unreviewable action, the action becomes reviewable," citing the specific example of an official making an incorrect legal statement as justification for a nonenforcement decision.  482 U.S. at 283; *see also Crowley*, 37 F.3d at 676 (recognizing that the Supreme Court has "squarely reject[ed] the notion of carving reviewable legal rulings out from the middle of non-reviewable actions") (citing *Bhd. of Locomotive Eng'rs*, 482 U.S. 270 (1987)).  Regardless, Plaintiffs are incorrect that the memorandum is "based entirely on the agency's legal interpretation of its statutory and regulatory obligations."  Opp'n 25.  As discussed above, it presents a "mingled assessment[] of fact, policy, and law."  *Crowley*, 37 F.3d at 677; *see supra*, pp. 12-14.

Finally, Plaintiffs dismiss Defendants' argument "that they did investigate Plaintiffs' complaints and . . . that the Court should not second guess the adequacy of those investigations," characterizing this as a "merits" argument "disguised as an argument about reviewability under the APA."  Opp'n 25 (citing Mem. 23-25).  Although the undisputed fact that Defendants did investigate Plaintiffs' complaints (albeit, in Plaintiffs' incorrect view, not "sufficient[ly]" or "meaningfully," Opp'n 26) is relevant to the merits, it is also relevant to reviewability, because it shows that OSC did not "adopt[] a general policy that is so extreme as to amount to an abdication of its statutory responsibilities."  *Heckler*, 470 U.S. at 833 n.4.  Rather, OSC complied with the statutory direction to investigate PPP complaints.  Plaintiffs just do not like the result of the investigation.

### III.    Plaintiffs Lack Standing

Plaintiffs lack standing because even if the Court granted their requested relief, it would not redress their injuries.  Plaintiff seek vacatur of the April 8 memorandum and the Closure Notices and an order directing OSC to reopen their investigations of Plaintiffs' complaints, but that would not redress their injuries because OSC would still possess the same unreviewable discretion not to pursue enforcement of their complaints.  *See* Mem. 25-27.

As an initial matter, Plaintiffs cannot establish standing because they fail to preserve their argument that the Closure Notices are unreviewable.  *See supra*, Part I.  Plaintiffs' standing theory is that "ordering OSC to reopen and investigate" Plaintiffs' "probationary complaints . . . would redress Plaintiffs' injuries."  Opp'n 26-27.  But Plaintiffs' failure to preserve their challenge to the closures of their complaints forecloses their request that the Court vacate those closures and direct the reopening and reinvestigation of those complaints.

Lack of preservation aside, Plaintiffs' standing theory fails on its own terms because even if the Court ordered OSC to reopen Plaintiffs' complaints, "[g]uessing whether [OSC] 'might choose to exercise its enforcement discretion' in a certain way 'requires speculation' beyond what standing doctrine permits."  *Cross*, 2025 WL 3280764, at *8 ((quoting *Am. First Legal Found.*, 153 F.4th at 1315).

Plaintiffs' contrary arguments are unpersuasive.  Plaintiffs first point out that "[t]here is . . . no requirement that a plaintiff 'show to a certainty that a favorable decision will redress [its] injur[ies].'"  Opp'n 28 (quoting *N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290, 305 (D.D.C. 2025)).  True enough, but while *certainty* of redress is not required, "'it must be *likely, as opposed to merely speculative*,' that [Plaintiffs'] 'injury will be redressed by a favorable decision.'"  *Cross*, 2025 WL 3280764, at *8 (emphasis added) (quoting *Lujan v. Defs. of Wildlife*,

504 U.S. 555, 561 (1992)).  Plaintiffs do not even attempt to argue that it is likely that OSC will pursue enforcement of their claims if the Court orders reinvestigation.

Plaintiffs fail in their attempt to distinguish the cases Defendants cite to show Plaintiffs' lack of standing.  Plaintiffs argue that *American First Legal Foundation v. Greer*, 153 F.4th 1311, is distinguishable because in that case, even if OSC investigated or disciplined the Department of Justice (DOJ) for improperly withholding documents, the court could not provide redress by directing DOJ to produce the documents.  Opp'n 28-29; *Am. First Legal Found.*, 153 F.4th at 1313. Rather, the actions of another non-party agency (in that case, DOJ) were necessary to provide redress.  But that is exactly the case here.  OSC cannot provide relief to Plaintiffs.  It can only seek relief from the MSPB, which would independently decide whether to grant any requested relief. *See* 5 U.S.C. § 1214(b)(1)(A), (b)(2)(C).

Plaintiffs also fail to distinguish *Cross*, which is on all fours with this case.  In *Cross*, the court held that the plaintiff lacked standing to challenge an EEOC memorandum deciding not to pursue enforcement of a set of cases, because even if the court ordered reinvestigation, it was "speculati[ve]" whether EEOC would pursue relief on the plaintiff's behalf.  2025 WL 3280764, at *8.  Plaintiffs attempt to distinguish *Cross* because the memorandum at issue "reflected a 'discretionary judgment concerning the allocation of enforcement resources' rather than the 'substantive requirements of the law.'"  Opp'n 29 (quoting *Cross*, 2025 WL 3280764, at *6).  But as explained above, the April 8 memorandum also reflected OSC's discretionary policy judgments on the cases "in which OSC should intervene," Compl. Ex. E, at 4, even where it characterized the underlying legal issues as "unsettled," *id.* at 2.  *See supra*, pp. 12-14.

The cases on which Plaintiffs rely are distinguishable and do not support their standing. Plaintiffs cite *Massachusetts v. EPA*, 549 U.S. 497 (2007), for the proposition that it is sufficient

if a plaintiff's injury is "reduced to some extent," *id.* at 526, even if by "a small incremental step," *id.* at 524.  In *Massachusetts*, a state alleged that it was harmed by greenhouse gas emissions, and the Supreme Court held that ordering EPA to regulate in a way that would reduce such emissions, even if only incrementally, would provide partial redress.  *Id.* at 525-26.  But even if redress is partial, it still must be "likely."  *Id.* at 517.  *Massachusetts* is inapposite because Plaintiffs here fail to show that even partial redress is likely.

For similar reasons, *Teton Historic Aviation Foundation v. United States Department of Defense*, 785 F.3d 719 (D.C. Cir. 2015), and *Orangeburg v. FERC*, 862 F.3d 1071 (D.C. Cir. 2017), are distinguishable.  Although redress in those challenges to agency action depended on how third parties would respond to the requested relief, in each case the D.C. Circuit found standing based on case-specific determinations that the requested relief from the court would make it likely, as opposed to merely speculative, that the plaintiff would obtain effective redress.

In *Teton Historic Aviation Foundation*, a party that wished to purchase historic military aircraft parts from the Department of Defense challenged a policy that made such parts ineligible for sale.  Although rescinding that policy would not make it certain that the Department of Defense's contractor (who managed such sales) would sell the parts that plaintiff sought, the court agreed with the plaintiff "that the Department's past history of selling equipment of this kind suffices to shift the mere possibility of redress to *the requisite substantial likelihood*," and the contractor's "desire to earn revenue from holding sales" provided "financial incentives that *would likely lead* it to sell whatever property the Department released."  785 F.3d at 725 (emphasis added).

Similarly, in *Orangeburg*, the Court engaged in detailed analysis of the economic incentives created by regulatory policies to determine that it was likely that the requested relief

would provide redress to the plaintiff.  The plaintiff, a South Carolina city, sought to finalize an agreement with a North Carolina utility to purchase electricity at reduced rates, but the North Carolina Utilities Commission (NCUC) issued a ruling that would make it uneconomical for the utility to do so.  *Orangeburg*, 862 F.3d at 1075-76.  The Federal Energy Regulatory Commission (FERC) then approved a merger agreement involving the utility that incorporated and approved the NCUC's ruling, and the plaintiff challenged that approval.  *Id.* at 1076.  In finding that the plaintiff's injury was redressable, the court noted that it was "certain and undisputed" that "this Court could" rule that the agreement's "empower[ment]" of NCUC "to act as a gatekeeper for interstate wholesale power transactions" was "in violation" of federal law.  *Id.* at 1083.  Given the parties' economic incentives, after such a ruling, NCUC would be "unlikely to maintain its policy of setting retail rates" that were disadvantageous to the plaintiff.  *Id.* at 1084.  Plaintiffs cite a remark from the Court that the relief sought "would diminish the obstacles" preventing the plaintiff from obtaining cheaper power, *id.*, and Plaintiffs argue that "[n]othing more is required" for redressability than diminution of obstacles to relief, Opp'n 31.  But that remark was in service of the Court's conclusion that given the economic incentives in play, "such relief would '*likely alleviate*' Orangeburg's injury" by leading NCUC to provide cheaper power.  *Orangeburg*, 862 F.3d at 1084 (citation omitted) (emphasis added).  Thus, diminishing a plaintiff's obstacles to relief is sufficient only if that makes it *likely* for plaintiff to obtain relief.

Here, Plaintiff makes no similar showing that it is likely that OSC would pursue enforcement of their complaints if the Court ordered OSC to reopen their complaints.  To the contrary, OSC's discretionary determination that cases like Plaintiffs' are not "matters in which OSC should intervene," Compl. Ex. E at 4, suggests that such a result is unlikely.

Finally, Plaintiffs argue that they have a procedural right to "a fair investigation," and if the Court orders OSC to conduct such an investigation, that will redress their "procedural" injury, regardless of whether the result of the investigation would be favorable to Plaintiffs.  Opp'n 31. Plaintiffs rely on cases that hold that where a statute confers a specific "procedural right to protect [a plaintiff's] concrete interests," such as the right to challenge an "agency's failure to prepare an environmental impact statement" before approving a construction project, an order vindicating that procedural right is sufficient for redressability "even though [the plaintiff] cannot establish with any certainty that the statement" will cause the agency to reject the underlying project.  *Lujan*, 504 U.S. at 572 n.7; *accord WildEarth Guardians v. Jewell*, 738 F.3d 298, 306 (D.C. Cir. 2013).

These cases regarding procedural injuries are inapposite because the CSRA does not empower a Court to order OSC to conduct a particular type of investigation that Plaintiffs contend would be "fair."  Opp'n 31.  As noted, OSC did investigate Plaintiffs' claims, though Plaintiffs deride those investigations not "legally sufficient" and "not meaningful[]."  *Id.* at 26.  The question is thus whether, under the CSRA, this Court can order OSC to reinvestigate those complaints in a particular manner.  But as a court in this District concluded with respect to EEOC investigations of Title VII complaints, given the agency's "underlying investigatory discretion," the Court "could not require a certain depth, length, or outcome from the investigation," even to prohibit the agency from "promptly dismiss[ing]" the complaint "again."  *See Cross v. EEOC*, 2025 WL 3280764, at *8.  The same is true of OSC, which the D.C. Circuit has held has "enforcement discretion, which the courts generally may not compel."  *Am. First Legal Found.*, 153 F.4th at 1315.  Thus, Plaintiffs are incorrect that the Court can redress a purported procedural injury by directing OSC to conduct "a fair investigation."  Opp'n 31.

**CONCLUSION**

For the foregoing reasons, the Court should grant Defendants' Motion to Dismiss and dismiss the Complaint for lack of subject-matter jurisdiction or failure to state a claim.

Dated:  February 17, 2026                    Respectfully Submitted,

                                             BRETT A. SHUMATE
                                             Assistant Attorney General
                                             Civil Division

                                             CHRISTOPHER R. HALL
                                             Assistant Director, Federal Programs Branch

                                             */s/ Jeremy S.B. Newman*
                                             JEREMY S.B. NEWMAN
                                             Trial Attorney
                                             United States Department of Justice
                                             Civil Division, Federal Programs Branch
                                             1100 L Street, N.W.
                                             Washington, DC 20005
                                             Tel: (202) 532-3114
                                             Fax: (202) 616-8470
                                             Email: jeremy.s.newman@usdoj.gov

                                             *Attorneys for Defendants*